**Susan TANNENBAUM, Plaintiff,**

v.

**Robert G. ZELLER et al., Defendants.**

**No. 71 Civ. 2104.**

United States District Court,
S. D. New York.

July 29, 1975.

Abraham J. Brill by Leonard I. Schreiber, New York City, for plaintiff.

Sullivan & Cromwell by Marvin Schwartz, Mark I. Fishman, Lawrence W. Nelson, New York City, for defendants F. Eberstadt & Co., Inc., F. Eberstadt & Co. Managers and Distributors, Inc. and Robert G. Zeller.

ROBERT L. CARTER, District Judge

## I.

This is a derivative action brought pursuant to Section 44 of the Investment Company Act of 1940, as amended (15 U.S.C. § 80a–43); Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa); and Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v). Plaintiff who has been a shareholder of record of the Chemical Fund (Fund) continuously since at least 1965, sues on behalf of the Fund.

The latter, a Delaware corporation, is an open end "mutual fund" registered with the Securities and Exchange Commission under the Investment Company Act. The Fund's principal activity is its varied investments in the chemical process industry. On December 31, 1965, the net total assets of the Fund were $433,849,751, and as of December 31, 1973, these assets had registered a more than 100% growth totaling $897,333,945. While the net total assets at the time of trial in 1974 were down to approximately 706 million dollars, a reflection of a general downward economic trend in this country, the Fund's performance still compared favorably with like investment operations.

The Fund's manager and distributor of shares, pursuant to written contracts, is F. Eberstadt & Co., Managers & Distributors, Inc. (M & D), also a Delaware corporation. M & D is a subsidiary of F. Eberstadt & Co., Inc., a brokerage house founded by the late F. Eberstadt, who also served on the board of the Fund. M & D provides staff, offices, advice and recommendations to the Fund and manages and supervises the business and affairs of the Fund, subject to the latter's Board of Directors, a majority of whom are disinterested or unaffiliated directors; that is, having no association with F. Eberstadt & Co. or M & D, within the meaning of Sections 2(a)(3), 2 (a)(19), 10(a) and 10(b), of the Investment Company Act, 15 U.S.C.

§§ 80a–2(a)(3), 80a–2(a)(19), 80a–10(a), and 80a–10(b). The management agreement and the distribution agreement obligate M & D to provide all statistical and research services at M & D's expense and to pay for the sale and distribution of Fund shares.

The unaffiliated or disinterested Fund directors are men of repute in academia, business and the professions. Among them are Dr. James S. Coles, director since 1968, currently President of Research Corporation, a foundation for the advancement of science, and before that President of Bowdoin College; Burt N. Dorsett, director since 1966, currently Vice President and Senior Investment Officer for College Retirement Equities Fund, and former Vice President for Investments at the University of Rochester; Alfred E. Driscoll, director since 1957, currently Chairman of the New Jersey Turnpike Authority and former governor of New Jersey; Dr. Bertrand Fox, director since 1970, recently retired Professor of Investment Banking at Harvard University Graduate School of Business Administration; Dr. Roger F. Murray, director since 1959, Professor of Banking and Finance at the Columbia University Graduate School of Business, formerly Vice President, responsible for portfolio management at Bankers Trust Co., and at one time manager of the investment portfolio of the Teachers Insurance and Annuity Association & College Retirement Equities Fund; Whitman Hobbs, director since 1972, John N. Martin, Franz Schneider, long time director, and Julian Avery, director until 1968, holding responsible positions in various corporate business institutions; Dr. Howard Rusk, director since 1962, well-known authority on rehabilitation and other medical questions; Leroy Marek, director from 1959–1973, a consultant on scientific problems and issues; and James J. Minot, director from 1968–1970, senior partner in Paine, Webber, Jackson & Curtis, Inc.

The parent company, Eberstadt (formerly a partnership), until 1972 owned all the capital stock of M & D, and since that time has held 75% of M & D's stock. Eberstadt since 1962 has been a member of the New York Stock Exchange (NYSE) and the National Association of Securities Dealers (NASD) and continuously since 1970, a member or associate member of the American Stock Exchange (AMEX). Robert Zeller, the only individual defendant served, is Vice Chairman of the Fund's Board and of M & D's Board. Prior to the incorporation of Eberstadt, Zeller was a partner in the firm. Since its incorporation he has been chairman of its Board and its chief executive officer.

Prior to 1971, the constitution and rules of the New York Stock Exchange required all members to charge at least a prescribed minimum commission on all transactions without regard to size or profitability. Moreover, the Exchange had always and continues to prohibit any direct rebate to a customer of any part of a commission earned by a member in the execution of a transaction, i. e., the consummation of a trade on the exchange. The costs of executing large orders, however, were not proportionately higher than the execution costs of small orders. But for the minimum commission regulation, broker-dealer firm members of NYSE in competing for business would have been willing to reduce their commissions based on quantity discounts to the customer. The unavailability of this form of discount led to a widespread practice in the mutual fund industry of customer directed "give-ups." Thus prior to December 5, 1968, it was common practice, custom and usage for a mutual fund through its manager to direct executing brokers on the NYSE and other national securities exchanges to "give-up" part of their commission to other exchange members who had no part in the execution of the transaction.[1] The "give-up" was nor-

---

[1]. For a fuller explanation of "give-ups" and their *raison d'etre*, see *Fogel v. Chestnutt*, 383 F.Supp. 914, 916–919 (S.D.N.Y.1974).

mally directed to a non-executing broker but one who had sold the shares of the mutual fund to the public and/or who had provided useful research and statistical information.

For the years 1965 through 1973, the Fund paid gross commissions to M & D, a portion of which M & D paid to non-affiliated dealers, in the amounts indicated below:

| YEAR | SALES CHARGE RECEIVED BY M & D | AMT. ALLOWED TO DEALERS | NET AMT. RETAINED BY M & D |
|------|-------------------------------|-------------------------|----------------------------|
| 1965 | $ 1,678,130 | $1,443,784 | $ 234,346 |
| 1966 | 2,126,476 | 1,676,727 | 449,749 |
| 1967 | 1,599,478 | 1,236,823 | 362,655 |
| 1968 | 1,440,831 | 1,118,046 | 322,785 |
| 1969 | 1,328,119 | 1,034,212 | 293,907 |
| 1970 | 2,098,752 | 1,619,762 | 478,990 |
| 1971 | 3,166,064 | 2,433,832 | 732,232 |
| 1972 | 6,334,902 | 4,885,042 | 1,479,860 |
| 1973 | 10,751,197 | 8,251,184 | 2,500,013 |

Between 1965 and 1973, the Fund paid brokerage commissions for the execution of purchases and sales of securities on behalf of the Fund on the NYSE, on which 80% of the portfolio transactions were executed, the AMEX and regional securities exchanges in the following amounts:

| YEAR | AMOUNT |
|------|--------|
| 1965 | $ 339,860 |
| 1966 | 447,653 |
| 1967 | 617,787 |
| 1968 | 501,604 |
| 1969 | 472,757 |
| 1970 | 651,596 |
| 1971 | 920,767 |
| 1972 | 939,660 |
| 1973 | 1,291,735 |

From January 1, 1965 through December 5, 1968, brokers who executed transactions were directed by the Fund through M & D to "give-up" a portion of their commissions to brokers and dealers who performed no services in the execution of these transactions. The "give-ups" were awarded to these non-executing brokers and dealers for services rendered in the selling of Fund shares and in providing statistical or research services without making any charge therefor. The "give-ups" constituted a substantial portion of the execution commission which, as previously suggested, executing brokers and dealers willingly shared because the low cost of execution was more than adequately met by the minimum commissions specified. These "give-ups" from 1965 to 1968 exceeded the following amounts:

| YEAR | AMOUNT |
|------|--------|
| 1965 | $ 81,686 |
| 1966 | 136,200 |
| 1967 | 214,600 |
| 1968 | 246,600 |

From January 1, 1965, through July 15, 1973, one of the basis on which brokers and dealers were chosen as executing brokers or dealers to handle a portfolio transaction for the Fund was to reward them for the sale of Fund shares. During the years 1965–1970, commissions paid by the Fund when the sale of Fund's shares was a criterion for selec-

tion of an executing broker were as follows:

| YEAR | AMOUNT |
|------|--------|
| 1965 | $271,910 |
| 1966 | 379,752 |
| 1967 | 510,346 |
| 1968 | 430,150 |
| 1969 | 363,036 |
| 1970 | 462,613 |

During that period and to date another basis for the selection of executing brokers was to compensate them for providing statistical and research services to the Fund through M & D. The commissions paid in connection with such transactions were as follows:

| YEAR | AMOUNT |
|------|--------|
| 1965 | $40,977 |
| 1966 | 42,900 |
| 1967 | 61,000 |
| 1968 | 45,967 |
| 1969 | 46,454 |
| 1970 | 91,662 |

These allocations are known as reciprocal brokerage, and approximately 98% of the Fund's portfolio transactions were allocated on this basis. After July 15, 1973, pursuant to a rule adopted by the NASD, the sale of Fund shares could no longer be a criterion for selection or non-selection of an executing broker or dealer.

While direct customer rebates were prohibited by the NYSE and AMEX and certain regional securities exchanges, a member firm serving as an investment advisor was not prohibited from crediting against its investment advisory fee some portion of the commission it earned from execution of portfolio transactions for the investment advisory client. Thus, M & D would have been permitted to credit against its management fee from the Fund some portion of any brokerage commission earned by Eberstadt in the execution of the Fund's portfolio transactions; and before "give-ups" were abolished, it would have been possible for Eberstadt to have received "give-ups" from other member firms who acted as executing brokers for the Fund and for such "give-ups" to be credited against the Fund's management fee.

That fee, while based on a percentage lower than most in the industry, was not insubstantial as the management fees between 1965 and 1969 listed below indicate:

| YEAR | AMOUNT |
|------|--------|
| 1965 | $1,160,563 |
| 1966 | 1,268,590 |
| 1967 | 1,428,228 |
| 1968 | 1,505,231 |
| 1969 | 1,521,868 |

On March 20, 1970, and on March 14, 1971, the formula for computation of the management fee was revised, and the fees in the years since have been as follows:

| YEAR | AMOUNT |
|------|--------|
| 1970 | $1,662,203 |
| 1971 | 2,247,468 |
| 1972 | 3,097,640 |
| 1973 | 3,361,470 |

"Give-ups" were abolished by a rule of the NYSE effective December 5, 1968. Recapture of commissions or a portion thereof, however, was permissible in other respects until adoption of Article IX, Section 7(k) of the Constitution of the NYSE on January 29, 1973, and of the present Rule 318 of the NYSE on February 1, 1973. Similar rules have now been adopted by the AMEX and various regional exchanges.

The plaintiff's basic contention is that from January 1, 1965, until December 5, 1968, when "give-ups" were prohibited by NYSE rules, and up to the present when recapture of excess commissions was available, defendants were required to use the Fund-directed "give-ups" and the recapture of excess commissions for the benefit of the Fund; that prior to December 14, 1970, the use of excess commissions to discharge M & D obligations under its management and distribution agreements with the Fund violat-

ed §§ 36 and 1(b)(2) of the Investment Company Act (15 U.S.C. §§ 80a–35 and 80a–1(b)(2)), entitling plaintiff to recover on behalf of the Fund; and that such use of excess commissions after December 15, 1970, violated §§ 36(a) and 1(b)(2) of the Investment Company Act (15 U.S.C. §§ 80a–35(a) and 80a–1(b)(2)), entitling plaintiff to recover damages on behalf of the Fund; and that such use from January 1, 1965, to the present constituted a breach of fiduciary duty at common law entitling plaintiff to recover damages on behalf of the Fund.

## II.

Plaintiff's chief reliance is on *Moses v. Burgin*, 445 F.2d 369 (1st Cir.), *cert. denied sub nom. Johnson v. Moses*, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971). Before proceeding further a few threshold observations may be helpful. Plaintiff may be correct in her view that the basic thrust of *Burgin* is that the management of a mutual fund is obligated to use all proper means to secure excess brokerage commissions for the benefit of the fund. However, application of that principle to this case will not necessarily result *a fortiori,* as plaintiff seems to suggest, in a conclusion that failure of M & D to direct "give-ups" or to recapture excess commissions through itself or Eberstadt violates the Investment Company Act or constitutes a breach of any common law obligation.

The facts in *Moses v. Burgin* are quite different from the facts developed in this case. As here, customer directed "give-ups" were paid over at management's behest to brokers who sold Fund shares. The court held that there was a duty to recapture the excess commissions for the benefit of the Fund if freely available, and that the directors had no choice. The court found that the management company as a member of NASD could have joined various regional exchanges as a special member and could have become qualified to receive "give-ups" on those exchanges. 445 F.

2d at 375. The court determined that the possibility of recapture through NASD or the regional exchanges was not disclosed to the unaffiliated directors, and that the management was under a duty to disclose all such information to the unaffiliated directors to permit them to decide what to do. Moreover, the court placed emphasis on a report of the Securities and Exchange Commission, Public Policy Implications of Investment Company Growth, H.R. Report, No. 2337, 89th Congress, 2d Sess. (1966) ("PPI"), issued one year before commencement of the litigation in *Burgin* in which it is stated, at p. 173, that "give-ups" should be directed to advisor underwriters for the purpose of applying those "give-ups" to reduce the advisory fees payable by the Fund. Also the court cited with confidence proposed Rule 10b–10 pursuant to which the SEC would require all excess commissions to be applied to a reduction of the advisory fee.

There is no evidence of non-disclosure by M & D to the unaffiliated directors in this case, and the SEC has fully retreated from its proposed Rule 10b–10 and at least in part from its unqualified position in the PPI report that "give-ups" be directed to reduction of advisory fees.

The *Burgin* formulation has not been adopted in this circuit. It has, of course, been discussed, *see Weiss v. Chalker,* 55 F.R.D. 168 (S.D.N.Y.1972) and 59 F.R.D. 533 (S.D.N.Y.1973); *Fogel v. Chestnutt,* 383 F.Supp. 914 (S.D. N.Y.1974); *Frankel v. Hyde,* CCH Fed. Sec.L.Rep. ¶ 94,486 (S.D.N.Y. April 4, 1974); and *White v. Auerbach,* CCH Fed.Sec.L.Rep. ¶ 93,617, (S.D.N.Y. September 19, 1972). Indeed, this court (Wyatt, J.) In *Fogel v. Chestnutt* finds *Burgin* unpersuasive.

Moreover, in view of the developments since *Burgin* one can be certain that whatever doubts might exist as to whether its basic thrust was non-disclosure, rather than a mandate that regional exchanges be utilized to secure "give-ups" for reduction of management fee,

there is little doubt in my mind that non-disclosure is the only precedential value that *Burgin* now retains.

## III.

In this case it is clear that F. Eberstadt from the very outset of the formation of the Fund took the position that his firm should not involve itself as executing broker for the Fund. The Board's consideration and discussion of the issue of "give-ups" and possibility of recapture were periodic and extensive. That discussion can be physically documented beginning in 1967. M & D sent to the Board on January 9, 1967, a summary of the SEC PPI report. In its memorandum, M & D advised the Board that the SEC "looks with favor on the practice of using brokerage business on portfolio transactions to reduce" management costs, and indicated that brokerage affiliates of two mutual fund organizations had been recapturing commissions on the Pacific Stock Exchange. (Plaintiff's Ex. 74, pp. 6–7). Thus, the Board knew then that the current "give-up" practices could be utilized through Eberstadt to reduce management's fee.

On January 26, 1968, the SEC issued a release which dealt with the level and structure of commission rates on the NYSE, reciprocal brokerage and "give-ups." It considered the possibility of commissions being recaptured by the manager through give-ups or by earning the executing commission and applying the "give-ups" or commission to reduction of the fee. The release proposed adoption of Rule 10b–10 which would have allowed "give-ups" only if recaptured for the benefit of the Fund. The Board received copies of the release and on February 20, 1968, the Fund's counsel, Sullivan and Cromwell, advised the Board in an opinion letter stating in part "assuming that the Board of Directors has considered all the relevant facts . . . including the possibility of adopting alternate methods of handling the Fund's brokerage business whereby a portion of the commissions might be used to reduce the management fee, and assuming further that, as a result of such consideration, the Board of Directors has come to the conclusion as a matter of reasonable business judgment" that no change in its current practice be made, that such a course in its view would be lawful. (Plaintiff's Exhibit 75).

The next day, February 21, 1968, Dorsett & Murray, who made up the subcommittee to review the management and distribution agreements with M & D distributed their written report. The report referred to the SEC release and its discussion of the possibility of recapture of commissions through "give-ups" and management receipt of commissions, proposed Rule 10b–10, and the opinion letter of counsel. The report pointed out that the Fund had paid $618,000 in brokerage commissions in 1967; that some $510,000 of this had been allocated to brokers based on volume of Fund shares sold; that it was a practice of the Fund with full knowledge of the Board and shareholders to use the allocation of brokerage business and Fund-directed "give-ups" "as additional compensation to dealers who sell Fund shares." It advised no change in the Fund's method of doing business "even though we recognize [the possibility of requesting the manager to act as executing broker or to] request give-ups on portfolio transactions which would be credited against the . . . management fee." (Plaintiff's Ex. 76). That same day the Board met, discussed the report, and voted to continue the existing arrangements.

On February 19, 1969, the same subcommittee in its review of the operation of the Fund and the management and distribution agreements filed a written report. The report noted that the subcommittee had again reviewed the basis on which brokerage commissions were allocated and recommended no change. It noted the abolition of "give-ups" as of December 5, 1968, by the NYSE. It recommended continuation of the practice of not using Eberstadt as executing bro-

ker even though recognizing that M & D could be requested to use Eberstadt in this capacity. (Plaintiff's Ex. 120). This report was discussed by the Board and it voted to continue existing arrangements.

The subcommittee report of January 22, 1970 (Plaintiff's Ex. 121) again reviewed and recommended continuation of the current practice of allocation of brokerage business and the policy of not using Eberstadt as executing broker. It recommended that the only restriction on the complete discretion of M & D in the allocation of brokerage commissions be that no change in the policy of not using Eberstadt as executing broker be made "without the specific concurrence of a majority of the unaffiliated directors". This report was distributed to the directors, and on February 18, 1970, the Board voted to continue its existing practice as to brokerage commissions.

In 1971, the subcommittee report was made by Dr. Murray and Governor Alfred Driscoll and again the subcommittee reviewed the brokerage allocation and the possibility of recapture and concluded it would be inadvisable to alter present arrangements. (Plaintiff's Ex. 122). Again the full Board concurred.

Copies of the decision relied on by plaintiffs here, *Moses v. Burgin*, were mailed to the Fund's directors on June 4, 1971. At the June 16, 1971, Board meeting a committee consisting of Dr. Murray, Governor Driscoll and Dr. Bertrand Fox, all unaffiliated directors, was appointed to review again the issue of the Fund's brokerage allocations and various alternatives. After consultation with counsel, the committee recommended no change. At the Board of Directors meeting of December 15, 1971, M & D reported that brokerage affiliates of other mutual funds had been utilizing regional securities exchanges to recapture brokerage commissions and had been applying them to reduction of management fees, and that SEC was expected to announce a position on the question soon. On March 27, 1972, and on January 15, 1973, the subcommittee after review of policy recommended no change. (Plaintiff's Ex. 123, 124). On January 14, 1974, the audit committee consisting of Governor Driscoll, and Messrs. Hobbs and Richard recommended adherence to existing policy. (Plaintiff's Ex. 78).

On the basis of this record, it is clear over the years that the Board's unaffiliated directors have given careful consideration to the issues raised by the plaintiff. The Board has examined the practices each year, noted what methods were available for the Fund to recapture excess brokerage commissions but each time has concluded that it should not do so.

On March 14, 1972, the articles of incorporation were amended to make specific that the Board had power "to determine . . . the manner and purposes of the allocation of brokerage commissions to be paid by the Fund." In the notice of annual meeting [2] distributed in connection with the March 14, 1972, shareholders meeting, it was stated in respect of the proposed amendment to the articles of incorporation that the Board felt it to be in the best interest of the Fund to continue the practice of having all portfolio transactions carried out by brokers not affiliated with Eberstadt and of not making any provision for recapture of commissions through affiliated brokers. The statement also said that the Board had directed the manager not to use Eberstadt as executing broker. (Plaintiff's Ex. 35, p. 6).

---

2. Plaintiff actually alleges that the proxy statement was false and misleading. No proxy statement was made a part of the record. In support of this allegation and succeeding references to proxy statements, plaintiff cited her Exhibits 28–38, which are the various notices of annual meetings from 1965 to date which enclosed the proxy for the year in question. The opinion, therefore, refers to these notices and modifies the plaintiff's contentions as claiming these notices violated the law.

The notice of meeting stated that this law suit had been instituted and that it "challenged the brokerage practices and the reasonableness of the management fees * * * [and] seeks injunctive relief and damages for the benefit of the Fund." (*Id.* at p. 10). The amendment was approved on March 14, 1972.

The plaintiff contends that from January 1, 1965 to date, each of the Fund's notice of annual meeting (Plaintiff's Ex. 28–38), Form N–1R and Form N–1Q reports (Plaintiff's Ex. 39–54; 88, 125–127) and prospectuses were materially false and misleading in failing to disclose: that "give-ups" and "reciprocals" were being used to discharge contractual obligations which M & D owed to the Fund under the management and distribution agreements; that the Fund was receiving less than net asset value because excess brokerage commissions were not being used to reduce management and distribution fees, and that prior to December 5, 1968, "give-ups" went to brokers who had no part in execution of portfolio transactions. However, the uncontroverted facts are that during this period, the unaffiliated directors were advised and kept fully abreast of their power if they wished to change existing policy, and of the SEC views and proposals on the issues. The Board voted no change and took full responsibility for the continuation of its policy of not using Eberstadt as executing broker.

Moreover, while the full implications of the policy were not spelled out, the policy was announced to the shareholders in every prospectus issued since 1965. During this period the shareholders have been informed of the Fund's policy of brokerage allocations and of not utilizing Eberstadt in this connection. Its 1965 prospectus stated that the manager places orders for purchase and sale of securities "with dealers where it believes the best execution can be obtained," and that allocation of brokerage business of the Fund was made "partly on the basis of the Fund shares sold and partly on the basis of services rendered." It also stated that the Fund had never utilized F. Eberstadt & Co. as an execution broker but that it might do so in the future but "if so, only in its capacity as broker in respect to transactions on a national securities exchange at regular exchange commissions and charges." (Plaintiff's Ex. 11).

The 1966 prospectus set forth the total brokerage fees paid by the Fund in 1965, indicated how much of that went to dealers based on Fund shares, and how much to dealers for providing statistical research and other services to the manager. It further stated that "these services do not reduce the expenses of the [m]anager by a material amount"; that the Fund currently intended to continue the same policy of allocation. The statement in the 1965 prospectus in respect of non-utilization of Eberstadt as execution broker was repeated (Plaintiff's Ex. 12). In 1967, 1968, 1969, 1970 and 1971, similar statements indicating how brokerage business was allocated and the same litany as to non-utilization of Eberstadt as an executing broker were repeated in the prospectuses (Plaintiff's Ex. 13, 14, 15, 16 and 17).

The 1972 prospectus changed this statement somewhat because policy had changed. It sets forth the total brokerage fees paid during 1971, indicating that 67% of such fees had been allocated to brokers who sold Fund shares and provided research and statistical information, 20% to those who sold shares but supplied no additional services, and 11% to brokers who provided only statistical and research information. As to all it was said that the brokers had supplied the best execution. It was stated that the Board had directed management not to use Eberstadt as execution broker, and reference was made to SEC's policy statement of February 2, 1972, indicating that reciprocal brokerage as a reward for selling shares should be terminated. (Plaintiff's Ex. 18, p. 10).

The 1973 prospectus stated that selection of brokers "is made strictly on the basis of the value and quality of the brokerage services rendered," set forth the total brokerage commissions paid and as usual asserted that Eberstadt did not participate in the Fund's brokerage business. (Plaintiff's Ex. 19, p. 8).

Plaintiff alleges that the Fund's January 27, 1972, notice of annual meeting was false and misleading. This statement was distributed in connection with a shareholders' meeting of March 14, 1972, convened to vote on the proposed amendment to the Fund's certificate of incorporation authorizing the Fund's Board "to determine in their discretion the manner and purposes of the allocation of brokerage commissions to be paid by the Fund." The notice represented that the purpose of the amendment was to "make explicit that which has always been implicit" that power to determine how the Fund's portfolio is used rests with the Board. This statement is alleged to be false because "*Moses v. Burgin* squarely held that directors of the fund lacked that power," and because the real purpose of the amendment was an effort to circumvent *Burgin*. (Plaintiff's Post-Trial Brief). Suffice it to say that, as already indicated, *Burgin* for me is clear authority only for the proposition that management in failing to disclose to non-affiliated directors all facts pertinent to their determination of Fund policy acts at its peril.

## IV.

█ █ The issue raised here concerns a problem that has long troubled the securities industry. Mutual funds are organized by brokerage firms which become investment advisors to the fund. The fund is a shell, and the advisor provides office space, staff and management services. The advisor or manager decides on investments and acts as distributor or underwriter for the sale of fund shares. Its function and compensation are determined by contract. It is argued by management that sales must be continuous so that the fund will have on hand sufficient cash to redeem shares. Since the management fee is tied to the size of the fund, it is usually to management's benefit to encourage sales. In 1966, the Securities and Exchange Commission's report, PPI at 203, showed that redemptions constituted a minor percentage of the Fund's assets. The figure ranged from a low of 3.9% in 1958 to a high of 6.4% in 1964; in 1965 the percentage was 5.6%. *Ibid.*

It was early recognized that mutual fund operation creates numerous conflicts of interest when a manager acts as advisor and distributor. These conflicts occur because the opportunity for self-dealing is great. But these hazards indigenous to mutual funds do not appear to be the problems raised in this litigation. The market performance of the Chemical Fund has been consistently above average when measured against the performance of other funds with similar investment programs and against the performance of the market in general. For example, between December 30, 1968, and November 14, 1974, Dow Jones Industrials registered a 31.5% loss, Standard & Poor's 425 showed a 28.9% loss, while Chemical Fund registered a 0.8% loss. Using the period September 30, 1971, to November 15, 1974, as a basis for comparison, the Fund evidenced the best market performance of some 14 comparable mutual funds, and did better than the general market as evidenced by Dow Jones Industrials and Standard & Poor's 425. When the period December 31, 1973, to November 15, 1974, is used, the Fund again ranks better in terms of performance in general as evidenced by Dow Jones Industrials or Standard & Poor's 425 and ranked sixth in respect of comparable funds. Exhibits showing expenses per dollar of assets for the years 1969–1970 (Plaintiff's Ex. 93–97, Schedule A) demonstrate that the Fund again compares favorably with other comparable mutual funds. Moreover, it is also established that churning is not an issue, since the brokerage commissions

paid by the Fund are below that of the industry as a whole. The parties have stipulated that since prior to 1965, in selecting brokers for the execution of the Fund's portfolio transactions, management's primary concern has been at all times "the price and quality of the execution to be provided to the Fund" (Pre trial order ¶ XXII). We have here, therefore, no issue of a manager engaging in any transactions for personal profit, apart from the management fee. *Cf. SEC v. Capital Gains Research Bureau Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

When *Moses v. Burgin* was decided, fixed commissions and prohibition against direct customer rebates were the practice. The institutional funds engaged in huge transactions but quantity discounts were not permitted. Brokerage commissions were far in excess of the costs and reasonable profit on the transaction. Thus "give-ups" came into being. Managers of mutual funds used "give-ups" to reward brokers for statistical and research services. Plaintiff contends that paying others for such services was unwarranted since the contract with the manager required M & D to provide these services at its own expense. Defendants contend that M & D used the research services of others to test the soundness of its own information. But these practices were done with the unaffiliated directors having all the facts and specifically approving the practice and with full disclosure to shareholders. Since the fundamental purpose of the federal securities laws is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry," *SEC v. Capital Gains, supra,* at 186, 84 S.Ct. at 280, it cannot be said that any violation has been disclosed on this record. (Emphasis in the original).

What is involved here is the exercise of a good faith business judgment. On the facts developed before me, I have no basis for finding that the Board failed to exercise such care and diligence in respect of the matters in controversy that careful and prudent men could reasonably be expected to exercise under similar circumstances. *See Ballantine on Corporations,* § 63 (Rev.Ed. (1946)). When questions arose the Board sought and relied upon the advice of counsel which alone is sufficient to free them of liability. *See Spirt v. Bechtel,* 232 F.2d 241, 247 (2d Cir. 1956). Nor has any fiduciary obligations of management been breached. The policy of the Board and of Eberstadt from the outset was to seek to keep conflicts of interest in respect of M & D as manager and adviser of the Fund and M & D as an Eberstadt subsidiary to a minimum. This poses a real problem in the mutual fund field, *see Comment,* Duke L.J. 429, 432 (1972); *Note,* 68 Colum.L.Rev. 334 (1968); Mundheim, *Some Thoughts on the Duties and Responsibilities of Unaffiliated Directors of Mutual Funds,* 115 U. of Pa. L.Rev. 1058 (1967).

That what is involved here is not an infraction of federal law but policy and an exercise of judgment is made clear in the February 2, 1972, Special Report by the SEC on the Future Structure of the Securities Market, 137, Part II, Bureau of National Affairs, at page 6:

> "[w]hile the Commission is concerned that the level of commissions be reasonable in all transactions . . . obtaining the best brokerage services, not merely the amount of the commission must be the ultimate criterion."

Continuing at page 7, the report describes investment research as "a fundamental element of the brokerage function for which bona fide expenditure of the beneficiary's funds is completely appropriate." The report discusses three types of institutional membership on securities exchanges. Membership on an exchange to be used primarily as a vehicle for recapture of commissions was specifically condemned. It discussed the question of exchange members engaged primarily in public brokerage but also engaged in money management and per-

forming brokerage for the accounts it manages. It did not condemn the practice of a fund whose manager is affiliated with a broker-dealer who does business with the public and also executes some transactions for the affiliate. The Commission did not condemn this practice, because where the broker-dealer was directly managing and advising, it could carry out transactions for these accounts and the public (pp. 8–9). Commissioner Owens dissented from this portion of the report. *Id.* at p. 10. He would prohibit institutions doing business through a ·broker-dealer it controls and broker-dealers from doing portfolio brokerage for accounts it manages—the very policy which the Fund's Board has adopted. *See* Miller & Carlson, *Recapture of Brokerage Commissions By Mutual Funds*, 46 NYU L.Rev. 35 (1971).

The unaffiliated directors placed a higher value on having the Fund's portfolio transactions free from any taint of self-dealing by Eberstadt; avoiding an appearance that securities in which Eberstadt has a position were being pushed and in attempting to make certain in appearance and in fact that the investments the Fund makes were based on objective good faith and not self-interest of the brokerage firm with which it is affiliated.

A recent amendment, Section 6, Securities Acts Amendments of 1975 (Pub.L. 94–29), to the securities law would appear now to bar Eberstadt from any involvement in the portfolio transactions of the Fund. The plaintiff properly points out that the new amendment applies only after May 1, 1978, and does not affect defendants' liability prior thereto. This, of course, is true. *Moses v. Burgin,* viewed in the light of the amendment and the modification in SEC approach between 1966 and the present to the question raised here, must be interpreted to accord with decisions holding that a requirement of full disclosure and lack of misrepresentation encapsulates the impact of the federal securities laws. Moreover, the new law undergirds the flooring on which the court's view is based that the Fund policy under attack is clearly an exercise of sound business judgment and outside the reach of the jurisdiction of this court. In summary, I find no basis for liability under either the federal securities law or the common law. Accordingly, judgment is ordered for the defendant.

The above constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

So ordered.