**Susan TANNENBAUM,**
**Plaintiff-Appellant,**

**v.**

**Robert G. ZELLER et al.,**
**Defendants-Appellees.**

**No. 576, Docket 75–7503.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 9, 1976.

Finally Submitted May 20, 1976.

Decided March 4, 1977.

**404**

Leonard I. Schreiber, New York City (Abraham J. Brill, New York City, of counsel), for Susan Tannenbaum.

Marvin Schwartz, New York City (Mark I. Fishman and Sullivan & Cromwell, New York City, of counsel), for F. Eberstadt & Co., Inc., F. Eberstadt & Co., Managers and Distributors, Inc., and Robert G. Zeller.

Robert D. Mercurio, New York City (E. Roger Frisch, and Walsh & Frisch, New York City, of counsel), for Chemical Fund, Inc.

Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, Jacob H. Stillman, Asst. Gen. Counsel, Edward A. Scallet, Atty., SEC, Washington, D. C., for Securities and Exchange Commission, amicus curiae.*

Before LUMBARD and TIMBERS, Circuit Judges, and BRYAN, District Judge.**

FREDERICK van PELT BRYAN, District Judge:

The plaintiff in this derivative action is a shareholder of Chemical Fund Inc., a mutual fund (the Fund). She sued on behalf of the Fund against the Fund's investment adviser, F. Eberstadt & Co., Managers and Distributors, Inc., its parent company, F. Eberstadt & Co., Inc., and Robert G. Zeller, a principal of the Fund, its investment adviser, and the parent company, for alleged unlawful failure to recapture portfolio brokerage commissions for the benefit of the Fund and for alleged inadequate disclosure of the Fund's brokerage practices to Fund shareholders.

After trial without a jury before Judge Robert L. Carter in the Southern District of New York on the question of liability only, judgment was entered dismissing the complaint. Judge Carter's opinion below is reported at 399 F.Supp. 945 (S.D.N.Y.1975). Plaintiff appeals from that judgment.

The appeal presents troublesome questions concerning the duties of investment advisers and directors of mutual funds with respect to recapture of portfolio brokerage commissions for the benefit of the fund. The applicable legal principles were largely laid down by this court in Judge Friendly's comprehensive opinion in *Fogel v. Chestnutt*, 533 F.2d 731 (2d Cir. 1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86, 45 U.S.L.W. 3250 (1976), which approved with some qualifications the holdings of the First Circuit in *Moses v. Burgin*, 445 F.2d 369 (1st Cir.), *cert. denied*, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 537 (1971), the only previous court of appeals decision dealing with the recapture problem. A basic question here is whether application of the *Fogel* and *Moses* principles to the facts in the case at bar requires reversal of the dismissal of the complaint by the court below.

The essential questions which we find presented and our rulings thereon are as follows:

(A) Did the manager and interested Fund directors have a duty to recapture excess commissions for the benefit of the Fund either under the Fund's charter or under the various agreements between the Fund and the adviser?

We hold they did not.

(B) Did the manager and interested directors violate their duty of disclo-

---

* The amicus brief of the Securities and Exchange Commission (SEC) was filed at the request of the court on May 7, 1976.

** Frederick van Pelt Bryan, of the Southern District of New York, sitting by designation.

sure to the independent directors under *Moses* and *Fogel*?

We hold they did not.

(C) Did failure to recapture violate section 36 of the Investment Company Act of 1940?

We hold it did not.

(D) Did the proxy statements for the years 1967–1971 violate the disclosure provisions of the federal securities laws?

We hold they did and remand for determination of what damages, if any, were caused by such violations.

## I.

At the outset, a review of the background of the recapture problem in the mutual fund industry is in order. Since Judge Friendly's opinion in *Fogel*, and the authorities there cited,[1] cover this subject in considerable detail, the discussion here will be limited to what is essential for an understanding of the problems presented in this case.

The mutual fund industry is in many ways unique, which in part explains the specific federal regulatory legislation concerning it. *See, e. g.*, Investment Company Act of 1940, 15 U.S.C. § 80a–1, *et seq.*; Investment Advisers Act of 1940, 15 U.S.C. § 80b–1, *et seq.* A mutual fund is a "mere shell," a pool of assets consisting mostly of portfolio securities that belongs to the individual investors holding shares in the fund. The management of this asset pool is largely in the hands of an investment adviser, an independent entity which generally organizes the fund and provides it with investment advice, management services, and office space and staff. The adviser either selects or recommends the fund's investments and rate of portfolio turnover, and operates or supervises most of the other phases of the fund's business. The adviser's compensation for these services is a fee which is usually calculated as a percentage of the fund's net assets, and thus fluctuates with the value of the fund's portfolio. Portfolio transactions are carried out by brokers selected by the adviser, who receive commissions at the regular rates therefor. The sale of fund shares to new investors is generally the responsibility of a "principal underwriter" who is usually the adviser itself or a close affiliate. Actual sales are made by brokers or dealers selected by the underwriter, and the sales charge or "load" is divided between the selling broker or dealer and the underwriter.[2]

This management structure contrasts sharply with that of a typical corporation. In the usual corporate situation, the interests of management and shareholders are identical on most matters. Since the officers who run the corporation are paid directly by the corporation and usually have a substantial equity investment in it, they devote themselves to profit maximization and thus act in the best interests of both the corporation and themselves. Control of a mutual fund, however, lies largely in the hands of the investment adviser, an external business entity whose primary interest is undeniably the maximization of its own profits.

While the management and shareholders of a mutual fund have certain parallel interests (such as improving the quality of investment performance by increasing the value of the fund's portfolio and thus raising both the value of fund shares and the investment adviser's fee), there are important areas in which their interests may conflict. These include the level of management fees and sales charges, and various aspects of portfolio transactions. Mundheim, *Some Thoughts on the Duties and Responsibilities of Unaffiliated Directors of*

---

**1.** *See also* Deutsch, *Fogel v. Chestnutt: The Meaning of an Opinion*, 4 Sec.Reg.L.J. 375 (1977).

**2.** "Sales load" is defined in section 2(a)(35) of the Investment Company Act, 15 U.S.C. § 80a–2(a)(35) as

the difference between the price of a security to the public and that portion of the proceeds from its sale which is received and invested or held for investment by the issuer. . . .

*Mutual Funds,* 115 U.Pa.L.Rev. 1058, 1059–60 (1967). The situation caused by this unique mutual fund structure was serious enough to prompt the observation by the First Circuit that "self-dealing is not the exception but, so far as management is concerned, the order of the day." *Moses v. Burgin, supra,* at 376. *See Galfand v. Chestnutt Corp.,* 545 F.2d 807, 808 (2d Cir. 1976).

Congress sought to minimize the possibilities of abuse of position by mutual fund managers by means of the Investment Company Act of 1940, 15 U.S.C. § 80a–1, *et seq.* This statute expanded the disclosure provisions already applicable to the industry under the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.,* and the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.,* and imposed specific requirements as to the structure and operation of mutual funds. *See* Comment, *Mutual Funds and Independent Directors: Can Moses Lead to Better Business Judgment?,* 1972 Duke L.J. 429, 433–35. Thus what was then section 10 of the Investment Company Act of 1940, 54 Stat. 806, required that at least 40 percent of a mutual fund's board of directors not be officers or employees of the investment company or "affiliated" with its investment adviser. This key provision was designed to place the unaffiliated directors in the role of "independent watchdogs" who would assure that, in accordance with the preamble of the Investment Company Act, mutual funds would operate in the interest of all classes of their securities holders, rather than for the benefit of investment advisers, directors, or other special groups. The Act also placed specific restrictions on insider transactions, 15 U.S.C. § 80a–17, and required that the contracts governing the relationship between a fund and its investment adviser be approved by investors and reexamined periodically, 15 U.S.C. § 80a–15(a).[3]

While the 1940 Acts succeeded in correcting a number of obvious abuses which had been prevalent in the mutual fund industry prior to their enactment, it became apparent in the early 1960's that problems still remained. Believing that the existing regulatory scheme then relying on "unaffiliated" directors to police the industry had proved inadequate, the SEC set in motion a series of developments which raised for the first time the question of the recapture of portfolio brokerage commissions for the benefit of the fund, and eventually culminated in the Securities Act Amendments of 1975.

In *Fogel,* Judge Friendly summarized the origins of the recapture controversy:

At the root of the recapture problem was the historic practice of the New York Stock Exchange (NYSE) and other exchanges of charging a fixed rate of commission on each share traded regardless of the size of the transaction (except for the odd-lot differential). Since the costs of executing an order do not vary in accordance with size, the large sales and purchases at the command of investment advisers of mutual funds were particularly attractive orders. At first fund managers allocated their brokerage business to reward brokers who had been helpful in selling the fund's shares, in furnishing advice, or in doing both; orders allocated as rewards were known as "reciprocals." However, as the business grew, the practice of reciprocals resulted, especially for the large funds, in using too many brokers, some of whom were not the best qualified to execute the particular order placed with them. Hence there developed the practice of relying on a few executing brokers who were then instructed to "give-up" a portion of their commissions, sometimes as much as 75%, to another broker whom the fund manager wished to reward. On NYSE this

---

**3.** In 1970, section 2(a)(19), 15 U.S.C. § 80a–2(a)(19), was added to the Act defining the term "interested person" to include those having close family or substantial financial or professional relationships with investment companies, their investment advisers, principal under-

writers, officers, and employees. This concept was substituted for the "non-affiliated" requirements for fund directors under section 10 of the Act so as to require that the board be composed of at least 40 percent "non-interested" persons.

was permitted only in favor of another member, but six of the seven regional exchanges permitted "give-ups" in favor of non-members as well, provided they were members of the National Association of Securities Dealers, Inc. (NASD). 533 F.2d at 735 (footnote omitted).

The proper use of the "excess" portion of brokerage commissions—that over and above what a broker would charge for his execution services were it not for the exchanges' fixed rates of commission—soon became a central question. Judge Friendly notes SEC awareness of the issue as early as 1963 when it issued its Report of the Special Study of Securities Markets, H.R. Doc.No.95 Pt. 4, 88th Cong., 1st Sess. (1963). The SEC there concluded:

1. The pattern of reciprocal business in the mutual fund industry is unique. The economies of the volume of securities transactions generated by the mass purchasing power of the funds for the most part are of minor benefit to the funds themselves. The primary beneficiaries are their investment advisers and their frequently related principal underwriters who to a large extent use reciprocity to reward the sales efforts of fund retailers, thereby increasing their own rewards. The use by fund advisers of investment advice and research provided by brokerage firms in return for fund brokerage, without diminution of their investment advisory fees, is another indication of the manner in which they are the primary beneficiaries of reciprocal business. This unbalanced reciprocal structure is a direct outgrowth of a minimum commission rate structure which prohibits volume discounts and rebates. In the broad study of the commission rate structure recommended to the Commission in chapter VI–I, appropriate consideration should be given to the desirability and appropriate form of a volume discount from the viewpoint of mutual funds.

*Id.* at 234, quoted in *Fogel, supra,* at 735–36.

The SEC's first explicit pronouncement on the subject of recapturing excess brokerage commissions came in late 1966, in its Report on the Public Policy Implications of Investment Company Growth (PPI), H.R. Rep.No.2337, 89th Cong., 2d Sess. (1966). The commission detailed the give-up and reciprocal practices which were being used to reward brokers furnishing sales and research services to mutual funds. It then described the mechanisms that some mutual funds had developed for recapturing excess commissions for the funds' direct cash benefit—which relied upon exchange rules permitting the reduction of the adviser's fee by some portion of brokerage commissions it received as give-ups or for actual execution—and concluded that this course of action probably conferred greater benefits on the fund shareholders than alternative use of excess commissions. The SEC also observed, however, that until such time as these recapture procedures became widespread in the industry, any adviser-underwriter to a dealer-distributed fund who utilized them would find certain dealers disinclined to promote sales of its fund's shares since they could more profitably promote those of its competitors which did not recapture commissions.[4]

---

4. This important passage of PPI, quoted in full in *Fogel, supra,* at 736, is reproduced here for the sake of both clarity and convenience:

(a) *Use of brokerage commissions to benefit the funds*

(i) *Reducing advisory fees.*—As has been noted, subsidiaries of four adviser-underwriters that maintain their own retail sales forces—among them three of the largest, Investors Diversified Services, Inc., Waddell & Reed, Inc., and Channing Financial Corp., as well as the smaller Imperial Financial Services, Inc.—are now members of the Pacific Coast Stock Exchange. These subsidiaries execute orders for the funds on the Pacific Coast Stock Exchange. More important, however, they obtain a considerable amount of nonfund business from broker-dealers who are dual members of the Pacific Coast Stock Exchange and other exchanges in return for fund brokerage business on other exchanges, primarily the NYSE. All the net profits of IDS's subsidiary and about 40 to 50 percent of the net profits of Waddell & Reed's and of Imperial Financial Services' subsidiaries have been applied to reduce advisory fees payable by the funds in those complexes.

At the same time that it viewed with approval the efforts of some mutual funds to turn reciprocal and give-up practices to the direct cash advantage of shareholders, the Commission stated a broader view that

certain aspects of these practices, particularly the customer-directed give-up, impair the orderly and proper functioning of the securities markets themselves.

PPI at 185. Accordingly, the SEC gave notice that "it believes that exchange rules must be changed so as to preclude customer-directed give-ups." PPI at 186.

The next development came when SEC Securities Exchange Act Release No. 8239 (Jan. 26, 1968) proposed a rule 10b–10 which, if it had been adopted, would have required a fund manager to recapture brokerage commissions whenever it was capable of so doing.[5] The release reasoned that mutual fund managers were under a fiduciary duty to utilize available recapture techniques. It also called for comment on a NYSE proposal to introduce a volume discount in brokerage commissions and make several changes in NYSE rules to limit give-ups and eliminate other reciprocal practices because of the distortions they caused in the market. The SEC viewed the NYSE proposal as essentially an alternative to its own proposed rule 10b–10. *Fogel v. Chestnutt, supra,* at 739–40.

Later in 1968 the SEC finally accepted NYSE proposals for a volume discount on orders exceeding 1,000 shares and other alterations in rates, and withdrew its proposed rule 10b–10. NYSE abolished customer-directed give-ups effective December 5, 1968, as did the regional exchanges shortly thereafter.

In 1969, the Commission continued to address the question of the duty of funds to recapture. In SEC Securities Exchange Act Release No. 8746 (Nov. 10, 1969), quoted in *Fogel, supra,* at 741, the General Counsel for the SEC, Philip A. Loomis, Jr., stated:

You first ask whether mutual fund management has a fiduciary duty to acquire a stock-exchange seat directly or through an affiliate, in order to utilize this means to recapture brokerage which in turn will be offset against management charges. We do not believe that management has this duty if in the exercise of its best business judgment management determines that it is not in the best interests of the fund to create such an affiliate. Proposed Rule 10b–10, as published for comment on January 26, 1968, to which you refer, has been withdrawn.

The release went on to note the Commission's understanding that the exchange rules abolishing give-ups did not prohibit the existing arrangements which a few mutual funds had made for the recapture of a portion of their commissions. It also cautioned that if a mutual fund management did acquire a seat on a regional exchange

Widespread emulation by institutional investors of the precedent set by these four complexes could have a marked effect on the economics of the securities industry. Within the framework of the existing commission rate structure it is a method whereby mutual fund shareholders can derive greater benefits than they have heretofore received from fund brokerage commissions. However among dealer-distributed funds the important role that portfolio brokerage plays in the competition for dealer favor has kept fund managers, with few exceptions, from using exchange memberships to reduce costs of the funds.

Similar competitive factors have also operated against the use, for the benefit of the funds and their shareholders, of regional exchange rules permitting give-ups to any member of the NASD on transactions executed on those exchanges. It would not be inconsistent with those rules for dealer-distributed funds to direct give-ups to their adviser-underwriters, all of whom are NASD members, for the purpose of applying these give-ups to reduce the advisory fees payable by the funds. Unless and until such procedures become widespread, any adviser-underwriter to a dealer-distributed fund who chose to utilize fund brokerage in this manner would place itself at a disadvantage in competing for the interest of nonmember dealers in selling the fund shares which it distributes.

PPI at 172–73 (Footnotes omitted).

**5.** This is the SEC's interpretation of the proposed rule. Such an affirmative duty to recapture, however, does not emerge so clearly from its text. *See Fogel v. Chestnutt, supra,* at 739.

whose rules permitted the recapture of commissions through the use of that seat, there might be circumstances under which recapture would be required and management would not be free to retain revenues derived from that source for itself.

The next significant event occurred in 1972 when the SEC issued a Policy Statement on the Future Structure of the Securities Markets (Feb. 2, 1972). The *Fogel* opinion, *supra*, at 741–43, sets forth the pertinent passages in detail, and little would be gained by repeating them here. Suffice it to say that the Commission advocated the discontinuance of the use of portfolio brokerage to promote the sale of mutual fund shares, and the elimination of institutional memberships on the exchanges insofar as they were employed primarily as vehicles for obtaining recapture of commissions.

In response to this policy statement, the National Association of Securities Dealers proposed a rule abolishing the use of reciprocals to reward sales promotion by making sale of fund shares neither a qualifying nor disqualifying factor in the allocation of portfolio transactions. This rule became effective on July 15, 1973. The reaction to the other thrust of the policy statement, however, was quite different:

> By contrast, the validity of the SEC's conclusions on the evil of institutional memberships, which were quite at variance with the earlier pronouncements we have quoted, was vigorously challenged, notably by Elkins Wetherill, president of the PBW Stock Exchange, see Wetherill and Hendon, Institutional Membership and the Experience of the Philadelphia-Baltimore-Washington Stock Exchange, 13 Boston College Ind. & Com.Rev. 959 (1972). Senator Williams introduced a bill, S. 3169, 92d Cong. 2d Sess. (1972), which would remove the SEC's power to restrict institutional membership until one year after the effectiveness of a rule requiring negotiated rates on all transac-

tions exceeding $100,000. Nevertheless, the SEC promulgated Rule 19b–2, effective March 29, 1973, forcing every exchange to "require every member of such exchange to have as the principal purpose of its membership the conduct of public business."

*Fogel v. Chestnutt, supra,* at 743 (footnote omitted).

The final development was the Securities Act Amendments of 1975, which generally forbade exchange transactions for one's own account or that of an associate, as well as the imposition of fixed rates of commission by national securities exchanges—the cause of the whole problem. *See Fogel v. Chestnutt, supra,* at 734–44.[6]

Thus, the problem of recapture of mutual fund portfolio brokerage commissions became intertwined with and to a considerable extent absorbed by the broader problem of general policy with respect to the effect of brokerage commission allocations on the securities markets. In this connection, the stance of the SEC on the recapture question has considerable significance.

The Commission's position cannot be fairly characterized as consistent. The amicus brief filed by the SEC on this appeal at the request of the court frankly admits this and attributes the "possibly conflicting views" of the Commission on the recapture question to its dual responsibilities under the Investment Company Act and the Securities Exchange Act. A portion of that brief is instructive:

> Under the [Investment Company Act], the Commission focused primarily on the effect of the allocation of brokerage commissions on mutual funds, their advisers and their shareholders. At the same time, however, the Commission was more broadly concerned under the Securities Exchange Act with the effect of brokerage allocation on the securities markets. From the latter perspective, the Commission was concerned with such matters as the appropriateness of fixed commission

---

6. The SEC rescinded rule 19b–2 in response to congressional reports accompanying these amendments.

rates, the effect of such commissions on the structure of the securities markets, and the role of the Commission as an economic regulator.

As the Commission's thinking developed on these broader policy issues, and market characteristics continued to change and evolve, the Commission revised its prior positions to accommodate its market concerns. Undoubtedly, some persons regarded the Commission's later conduct as inconsistent with its prior positions on the narrower issues arising under the Investment Company Act.

The Commission's brief traces this "duality of approach" throughout all its discussion on recapture, and notes the agency's final determination to treat the practice as a problem of commission rates and market structure, rather than as a mutual fund problem. It concedes that

it is difficult to find guidance—in the context of this lawsuit, involving a specific fact situation raising questions of the fiduciary obligation of investment advisers—in many of the Commission's general statements on the recapture problem.

The SEC points out, however, that the history of its response to the recapture problem is not unimportant since "it illustrates the dynamic and constantly changing background in which the defendants' actions in this case must be judged."

With the foregoing background in mind, we turn to the specifics of the case before us.

## II.

Chemical Fund, Inc., a Delaware corporation, is an open-end, diversified investment company or mutual fund registered with the SEC under the Investment Company Act of 1940. Its investment objective is to attain growth of capital and income through investment in companies specializing in certain aspects of the sciences. As an "open-end" investment company, the Fund is required under sections 5(a)(1) and 2(a)(32) of the Investment Company Act, 15 U.S.C. §§ 80a–5(a)(1), –2(a)(32), to stand ready at all times to redeem its shares for their "net asset value", computed in accordance with the rules and regulations of the SEC, 17 C.F.R. §§ 270.22c–1, .2a–4. As of December 31, 1965, the Fund had total net assets of $433,849,751. At the time of trial, the Fund's total net assets were more than $700,000,000.

The Fund's investment adviser or manager and the distributor of its shares is, and has been for many years, F. Eberstadt & Co., Managers & Distributors, Inc. (M&D), a Delaware corporation. Pursuant to a written advisory contract, M&D makes investment advisory recommendations to the Fund's board of directors, and, subject to the approval of the board, manages the business and affairs of the Fund. It also furnishes the Fund with office space and ordinary clerical and bookkeeping services. As is customary in the industry, the compensation paid by the Fund to M&D for its services as the Fund's manager is based upon a percentage of the Fund's net assets, with an incentive adjustment for the Fund's investment performance.[7] At all relevant times M&D has been a member of the NASD.

Pursuant to a written distribution contract with the Fund, M&D arranges for the sale of Fund shares to the public through independent securities dealers at a price equal to net asset value plus a sales charge or commission. Under the terms of the distribution agreement, M&D retains less than a quarter of the sales charge and

---

7. The management fees for the years 1965 through 1969 were

| YEAR | AMOUNT |
|------|--------|
| 1965 | $1,160,563 |
| 1966 | 1,268,590 |
| 1967 | 1,428,228 |
| 1968 | 1,505,231 |
| 1969 | 1,521,868 |

On March 20, 1970, and March 14, 1971, respectively, the schedule of fees to be paid to M&D was revised. The management fees for each of the years 1970 through 1973 were:

| YEAR | AMOUNT |
|------|--------|
| 1970 | $1,662,203 |
| 1971 | 2,247,468 |
| 1972 | 3,097,640 |
| 1973 | 3,631,470 |

allows the balance to dealers who sell Fund shares.[8]

The parties have stipulated that at all times since at least January 1, 1965, when plaintiff's allegations commence, a majority of the Fund's board of directors have been neither "affiliated" nor "interested" persons within the meaning of the Investment Company Act. These unaffiliated or disinterested Fund directors were characterized by Judge Carter as men of repute in business and the professions.[9]

The defendant F. Eberstadt & Co. Inc. (Eberstadt), M&D's parent company, originally a partnership but later a Delaware corporation, is and has been since 1962 a member firm of the NYSE and a member of the NASD. Eberstadt later became a member of the American Stock Exchange as well.

Robert G. Zeller, the only individual defendant served, is vice-chairman of the Fund's board of directors, vice-chairman of M&D's board, and chairman of the board and chief executive officer of Eberstadt.

Except in unusual circumstances, whenever the Fund wishes to purchase or sell securities for its portfolio it is necessary for M&D to select a broker to execute the transaction or to deal directly with a dealer who owns or wishes to purchase the particular securities being purchased or sold. Total brokerage commissions paid in connection with such portfolio transactions on the NYSE (on which 80% of the transactions were executed), the American Stock Exchange, and regional exchanges ranged from $339,860 in 1965 to $1,291,735 in 1973.

The parties have stipulated that, in selecting brokers for the execution of portfolio transactions, M&D's primary concern has always been securing the best price and quality of execution available to the Fund, i. e., the best execution.[10] Only when two or more executing brokers could provide equal price and quality of execution were other criteria considered in the selection of brokers.

Until July 15, 1973, the criteria employed in selecting a broker were the broker's sales

---

**8.** For the years 1965 through 1973, the Fund paid gross commissions to M&D (on the sale of the Fund's shares as distinguished from portfolio transactions) and M&D re-allowed to non-affiliated dealers, the amounts indicated below:

| YEAR | APPROX. COMM. PAID M&D | APPROX. COMM. RE-ALLOWED |
|------|------------------------|--------------------------|
| 1965 | $ 1,678,000 | $1,443,000 |
| 1966 | 2,126,000 | 1,677,000 |
| 1967 | 1,599,000 | 1,237,000 |
| 1968 | 1,441,000 | 1,118,000 |
| 1969 | 1,328,000 | 1,034,000 |
| 1970 | 2,099,000 | 1,620,000 |
| 1971 | 3,166,000 | 2,434,000 |
| 1972 | 6,335,000 | 4,885,000 |
| 1973 | 10,751,000 | 8,251,000 |

**9.** This view was substantiated by his summary of their backgrounds:

Dr. James S. Coles, director since 1968, currently President of Research Corporation, a foundation for the advancement of science, and before that President of Bowdoin College; Burt N. Dorsett, director since 1966, currently Vice President and Senior Investment Officer for College Retirement Equities Fund, and former Vice President for Investments at the University of Rochester; Alfred E. Driscoll, director since 1957, currently Chairman of the New Jersey Turnpike Authority and former governor of New Jersey;

Dr. Bertrand Fox, director since 1970, recently retired Professor of Investment Banking at Harvard University Graduate School of Business Administration; Dr. Roger F. Murray, director since 1959, Professor of Banking and Finance at the Columbia University Graduate School of Business, formerly Vice President, responsible for portfolio management at Bankers Trust Co., and at one time manager of the investment portfolio of the Teachers Insurance and Annuity Association & College Retirement Equities Fund; Whitman Hobbs, director since 1972, John N. Martin, Franz Schneider, long time director, and Julian Avery, director until 1968, holding responsible positions in various corporate business institutions; Dr. Howard Rusk, director since 1962, well-known authority on rehabilitation and other medical questions; Leroy Marek, director from 1959–1973, a consultant on scientific problems and issues; and James J. Minot, director from 1968–1970, senior partner in Paine, Webber, Jackson & Curtis, Inc. 399 F.Supp. at 947.

**10.** It was also stipulated that during the period in question no commission paid by the Fund exceeded the minimum commission prescribed by the constitution and rules of the exchange on which the particular transaction was executed.

of Fund shares to the public and the usefulness of research and statistical services which it provided to the Fund through M&D. After July 15, 1973, as previously indicated, an NASD rule, binding on both M&D and Eberstadt as members, eliminated sale of Fund shares as a qualifying or disqualifying factor in the selection of executing brokers.

The brokerage commissions paid by the Fund when the sale of shares was a criterion for selecting an executing broker fluctuated from $271,910 in 1965 to $462,613 in 1970. The commissions paid by the Fund when research and statistical services provided were criteria for selecting an executing broker fluctuated from $40,977 in 1965 to $91,662 in 1970. During 1971 and 1972 over 98% of the Fund's portfolio brokerage in each year was allocated as "reciprocals" to brokers who either sold Fund shares or supplied statistical and research information.

As we have seen, prior to December 5, 1968, it was common practice for a mutual fund or its manager to direct executing brokers on the NYSE and other national securities exchanges to "give-up" part of their commissions to other exchange members who had sold shares to the public or who had provided useful research or statistical material, but who had not participated in any way in the execution of the transaction on the exchange. The give-ups on Fund portfolio transactions from 1965 to 1968 exceeded the following amounts:

| Year | Amount |
| --- | --- |
| 1965 | $ 81,686 |
| 1966 | 136,200 |
| 1967 | 214,600 |
| 1968 | 246,600 |

The NYSE permitted member firms who served as investment advisers to credit against the investment advisory fee some portion of the commissions earned by the member firm for the execution of portfolio transactions on behalf of the investment advisory client. Accordingly, the NYSE would have permitted M&D to credit against the management fee payable to it by the Fund some portion of any brokerage commissions earned by its parent Eberstadt in the execution of the Fund's portfolio transactions and, prior to the time when give-ups were abolished, a portion of any give-ups received by Eberstadt with respect to Fund brokerage business. Prior to December 5, 1968 such recapture would not have required participation by Eberstadt in the execution of portfolio transactions. After December 5, 1968, when give-ups were abolished, recapture was still available although then, appellant asserts, participation by either Eberstadt or M&D in portfolio transactions would have been necessary.[11]

Well aware of this possibility of recapture, the board of directors of the Fund, with the concurrence of the unaffiliated and non-interested directors, consistently directed that Eberstadt not act as broker in the execution of Fund portfolio transactions nor receive give-ups from other brokers in

11. The parties stipulated in this case that, during the period of time covered by the complaint, several techniques whereby excess brokerage commissions could be recaptured for the benefit of the Fund were available. At trial, basically three separate available techniques were discussed, all of which depended to some extent on rules of the New York, American, and regional stock exchanges which permitted the crediting of some portion of brokerage commissions on portfolio transactions received by an investment adviser against its management fee. First, prior to December 5, 1968 when give-ups were permissible, the Fund could have directed the brokers who executed portfolio transactions for it on the New York Stock Exchange to give up part of the commission to Eberstadt, a member firm of the NYSE, to be applied against the M&D advisory fee. Second, even after the abolition of give-ups, the Fund could have placed its portfolio transactions directly with Eberstadt for execution and directed it to reduce the management fee payable to M&D by the excess portion of the fixed commission. Third, the Fund could have executed portfolio transactions on the regional exchanges and had Eberstadt or M&D, as members of the NASD, receive give-ups before December 5, 1968, or qualify for "preferred rate non-membership" status and a reduced rate of commissions thereafter.

connection with Fund portfolio transactions.

Plaintiff, a shareholder of record of the Fund continuously since at least 1965, seeks to hold M&D, Eberstadt, and Zeller liable to the Fund for their part in implementing this decision of the unaffiliated and non-interested directors to forego recapture.[12] Jurisdiction was laid under section 44 of the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a–43; section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa; and section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

Plaintiff first contended that by causing the Fund to forego recapture and allocate commissions to reward brokers who sold Fund shares and supplied it with research and statistical information, the defendants violated the management and distribution agreements then in force between the Fund and M&D, provisions of the Fund's certificate of incorporation, and fiduciary duties imposed upon them by both the Investment Company Act of 1940 and common law. Plaintiff also claimed that the defendants failed to disclose accurately and fully to the unaffiliated or non-interested directors and to the shareholders the uses to which brokerage commissions were being put and the alternatives to those uses.

At the trial before Judge Carter, plaintiff rested her case in chief solely on the documentary evidence contained in 163 exhibits. The defendants called four witnesses: Zeller, Robert M. Maynard, a partner in Price Waterhouse & Company, auditors of the Fund; and Professors Roger F. Murray and Bertrand Fox, unaffiliated or non-interested Fund directors. In rebuttal, the plaintiff called Burt Dorsett, another independent[13] Fund director.

Judge Carter found "no basis for liability under either the federal securities law or the common law." 399 F.Supp. at 956. Accordingly, he entered judgment for the defendants dismissing the complaint. This appeal followed.

### III.

On this appeal appellant contends (1) that the failure to recapture violated the Fund's advisory and distribution contracts with M&D; (2) that the failure to recapture violated the Fund's certificate of incorporation; (3) that the defendants breached their fiduciary duties to the Fund in their dealings with the independent directors regarding recapture; and (4) that the defendants violated the disclosure provisions of the securities laws by failing to keep the shareholders of the Fund properly informed as to the recapture problem. We will address these contentions seriatim.

### A.

A key contention of appellant is that by allocating brokerage commissions and give-ups to reward dealers for selling shares and providing the Fund with research and statistical information, albeit at the direction of the independent directors on the Fund's board, the defendants violated the management and distribution contracts with the Fund. Appellant argues that, under these agreements, M&D was obligated to pay all the expenses relating to the promotion and sale of Fund shares and to provide research and statistical services to the Fund at its own expense. Through its allocation of the Fund asset of brokerage, appellant asserts, M&D profited at the expense of the Fund to the extent that it was able to avoid using its own funds to purchase sales promotion, research, and statistical services needed to discharge its contractual obligations. Appellant relies heavily on this allegation of self-dealing to support her other claims of breach of fiduciary duty and inadequate disclosure.

Appellees contend that both parties to the management and distribution agree-

---

12. Chemical Fund, Inc. is a nominal defendant and appellee in this action, but our references to "defendants" and "appellees" will not include it unless specifically noted.

13. The word "independent" hereafter will be used to describe directors who were neither "affiliated" nor "interested" within the meaning of the Investment Company Act. *See supra* at 406 and n.3.

ments at all times contemplated that brokerage would be allocated by the investment adviser to obtain sales promotion, research, and statistical services. They claim that this understanding was in accordance with the generally prevailing method of business in the industry, and that this usage added implicit terms to the management and distribution contracts. Judge Carter found that the allocation of brokerage for these purposes was done

> with the unaffiliated directors having all the facts and specifically approving the practice . . . .

399 F.Supp. at 955. He concluded that the management and distribution agreements had not been violated.

■ The management and distribution agreements are silent on the subject of allocation of excess portfolio commissions.

Since the industry usage of brokerage is not inconsistent with the pertinent provisions of the agreements,[14] evidence as to its existence and the parties' awareness of it during negotiations was properly admitted to clarify the intentions of the parties, *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770 (2d Cir. 1975), and to annex provisions in accord with the usage to those expressed in the agreements, 3 A. Corbin, Contracts § 556 (1960); 5 S. Williston, Contracts §§ 648, 652 (3d ed. 1961). *Contrast Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 841–42 (2d Cir. 1975).

The uncontradicted testimony of defendant Zeller was that the amount of compensation awarded to M&D under the distribution contract

> was arrived at by a negotiation process in light of all of the circumstances, includ-

---

**14.** The Fund's management agreement provided on January 1, 1965, and with minor changes not significant here continued to provide:

. . . .
> 2. The Manager shall furnish to the Board of Directors and officers of the Investment Corporation advice and recommendations with respect to the acquisition, by purchase, exchange, subscription or otherwise, of securities, and advice and recommendations with respect to other aspects of the business and affairs of the Investment Corporation; and shall, subject to the Board of Directors of the Investment Corporation, manage and supervise the business and affairs of the Investment Corporation.
> 3. The Manager shall supply the Board of Directors and officers of the Investment Corporation with all statistical information reasonably required by them and reasonably available to the Manager; shall furnish the Investment Corporation with an office, and with ordinary clerical and bookkeeping services at such office; and shall authorize and permit any of its directors, officers and employees, who may be elected as directors or officers of the Investment Corporation, to serve in the capacities in which they are elected. All services to be furnished by the Manager under this Agreement may be furnished through the medium of any such directors, officers or employees of the Manager.

. . . .
> 5. As compensation for the services performed and the facilities furnished by the Manager, including the services of any consultants retained by the Manager, effective January 1, 1965, the Investment Corporation

> shall pay the Manager . . . a quarterly fee, as per the following rates, of the average daily net assets of the Investment Corporation. . . .

The Fund's distribution agreement provided on January 1, 1965, and with minor changes not significant here continued to provide:
> 6. The Distributor shall assume and pay, or reimburse the Investment Corporation for, the following expenses of the Investment Corporation:
> A. Costs of qualifying the shares of the Investment Corporation for sale and, if necessary or advisable in connection therewith, of qualifying the Investment Corporation as a dealer or broker, in such states as shall be selected by the Distributor and fees payable to each state for continuing the qualification therein until the Distributor notifies the Investment Corporation that it does not wish such qualification continued.
> B. Costs of printing all copies of the Prospectus and of preparing and printing all other sales literature, if any, printed at the instruction of the Distributor.
> C. Counsel fees and expenses in connection with the foregoing.
> The Distributor shall also pay all its own costs and expenses and, *generally*, all costs and expenses connected with the sale of shares of the Investment Corporation, excluding issuance, transfer and registry charges and taxes, delivery and remittance expenses, and the costs of stock certificates, except that, the Distributor shall pay all expenses incurred in connection with splitting the shares of the Investment Corporation. (emphasis added).

ing the services which the adviser got from outside sources.

One of the "circumstances" he specified was the "known industry facts." He also testified that, while there was no explicit provision in the advisory contract which gave M&D the right to use a portion of brokerage commissions to reward firms that assisted it in providing research, such a provision "was implicit in the negotiation of the management fee." Zeller characterized the Fund's use of give-ups as "simply part of the brokerage practices of the times."

In response to a question concerning the compensation paid M&D under its management contract for research and statistical services, Dr. Roger F. Murray, an independent director of the Fund, testified as follows:

> The amount we were paying them was for what they could do, and they could not be an expert in all fields, and if they didn't have the benefit of those give-ups or commission business to use for getting outside additional facilities we would have had to raise their fee and make . . . arrange for them to buy them, because we were convinced it was essential to the performance of the fund that

that kind of exposure to other ideas get into the decision-making process of the fund.

He stated that while no explicit contractual provision authorized such use of brokerage, it was "fully understood that that would be done," and was made "explicit and clear in the prospectus and in the proxy statements. . . ." The record fully supports this assertion.[15]

■ Appellant adduced no evidence to rebut the testimony that the allocation of brokerage business and give-ups by M&D on the basis of shares sold and services rendered was customary in the industry and specifically contemplated by the Fund's management and distribution agreements. Appellees' evidence to this effect stands uncontradicted and, on this record, the conclusion that the agreements were not violated is sustained.[16] *Compare Moses v. Burgin,* 316 F.Supp. 31, 59–60 (D.Mass.1970), *rev'd on other grounds,* 445 F.2d 369 (1st Cir.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971).[17]

**B.**

■ Appellant's next argument can be disposed of briefly. Relying on *Moses v.*

**15.** The 1965 prospectus stated that "brokerage business is allocated to dealers partly on the basis of Fund shares sold and partly on services rendered." Subsequent prospectuses included similar statements as well as specification of the dollar amounts or, in 1972, percentages of brokerage allocated to dealers on the basis of shares sold and services rendered. The 1973 prospectus stated, as was then the case, that selection of brokers by the Fund was made "strictly on the basis of the value and quality of the brokerage services rendered," rather than on the basis of sales promotion. The proxy statements from 1966 on made corresponding, although more limited, disclosures.

These contemporaneous disclosures obviously support the conclusion that the rate of M&D's compensation under the advisory and distribution contracts was fixed with the knowledge that M&D would allocate brokerage to reward dealers providing it with additional research and sales promotion for the Fund's benefit. The whole course of dealing between the adviser and the Fund is to the same effect.

**16.** It is worth noting that while the SEC took no position on the interpretation of the Fund's

advisory contract in its amicus brief, it acknowledged that

> most advisory contracts in the mutual fund industry contained relatively standard provisions, including one on research, and . . . it was nevertheless the general practice in the industry to pay for research with excess brokerage commissions.

Even appellant conceded in her reply brief that the practice was widespread in the industry, although she contends that most mutual funds chose not to defend it when challenged by litigation.

**17.** Unlike Judge Wyzanski, we believe that, *unless the parties agreed otherwise,* industry usage supplied the management and distribution contracts with additional terms authorizing the allocation of brokerage and give-ups by the investment adviser to promote sales and obtain services so long as this was legally permissible. We also conclude, however, that the contracts as thus construed do not violate section 15 of the Investment Company Act, 15 U.S.C. § 80a–15.

*Burgin, supra,* at 374, she contends that defendants' allocation of commissions to compensate dealers for sales promotion and research violated an express provision of the Fund's certificate of incorporation that requires it to receive not less than "net asset value" for each share sold.[18] The *Moses* court observed that

> [i]f Fund receives the asset value of new shares, but at the same time rewards the selling broker with give-ups that it has a right to recapture for itself, then the net income Fund receives from the process of selling a share is less than asset value. The existing shareholders have contributed—by paying more than otherwise necessary on Fund's portfolio transactions—to the cost of the sale, which was supposed to have been borne by the new member alone.

445 F.2d at 374.

In *Fogel,* Judge Friendly rejected this reasoning and held that

> [a]lthough the argument is not without force, we think it presses too far. The term "net asset value" is one of art in the mutual fund industry and is elaborately defined in the certificate of incorporation. The objective of the charter provision was to prevent dilution of per share net asset value by the issuance of new shares at a discount; defendants' failure to recapture part of the commissions on portfolio transactions does not result in such dilution. Plaintiffs' real complaint is not that new shareholders did not pay net asset value but that the Adviser, for selfish motives, refrained from handling portfolio transactions in a manner that would have diverted a portion of the com-

missions to itself, with an attendant decrease in the advisory fee—in substance a charge of breach of a fiduciary duty resulting in corporate waste.

533 F.2d at 744–45.[19]

His holding is equally applicable in the case at bar and disposes of this contention of the appellant.

## C.

Appellant next contends that the conduct of the defendants in implementing the Fund's decision to forego recapture constituted a breach of fiduciary duty under both the Investment Company Act and common law.[20] To resolve this issue, we must determine whether the Investment Company Act imposed on the Fund and the persons who controlled it an absolute duty to recapture excess brokerage commissions, and, if not, whether the decision to forego recapture here is justifiable as a proper exercise of the informed discretion reposed in the board of directors of a mutual fund under the Act.

Section 36 of the Investment Company Act of 1940, which prohibited "gross misconduct or gross abuse of trust" as originally enacted, 54 Stat. 841, and "breach of fiduciary duty involving personal misconduct" as amended in 1970, 15 U.S.C. § 80a–35, established a federal standard of fiduciary duty in dealings between a mutual fund and its adviser. *Fogel v. Chestnutt, supra,* at 745, *citing Brown v. Bullock,* 294 F.2d 415, 421 (2d Cir. 1961), and *Rosenfeld v. Black,* 445 F.2d 1337, 1345 (2d Cir. 1971), *petition for cert. dismissed,* 409 U.S. 802, 93

---

**18.** Article Eighth, Section B 5(b) of the Fund's charter, has at all times provided that the board of directors shall have power to authorize the issuance or sale of shares—from time to time—"for a consideration, per share, to the [Fund] not less than the asset value, per share, of the outstanding shares of the [Fund]."

**19.** Judge Friendly also noted a comment on *Moses* which questioned the soundness of this "charter" argument in view of the fact that the First Circuit in that case apparently rested its finding of liability on the lack of full disclosure

to the independent directors, rather than on the charter provision alone. *See Fogel v. Chestnutt, supra,* at 744 n.12.

**20.** Since we find the standards applicable to fiduciaries under the Investment Company Act at least as stringent as those at common law, *see Galfand v. Chestnutt Corp., supra,* at 811, we shall restrict our consideration of appellant's breach of fiduciary duty argument to the standards laid down by the Investment Company Act.

S.Ct. 24, 34 L.Ed.2d 62 (1972). In its original form, this section authorized SEC injunctive actions and, by implication,[21] private damage actions by investors against fiduciaries who failed to meet its standards. The remedial 1970 amendment of the section added a subsection (b) which explicitly granted a private right of action to recover unreasonable compensation paid by a fund to its investment adviser. Congress did not intend this modification to abrogate the private action already recognized under the Act for other types of breach of fiduciary duty. See Fogel v. Chestnutt, supra; Moses v. Burgin, supra, at 373, 373 n.7, 384; S.Rep.No.184, 91st Cong., 1st Sess. 16 (1969), U.S.Code Cong. & Admin.News 1970, p. 4897; H.R.Rep.No.1382, 91st Cong., 2d Sess. 38 (1970). But see Monheit v. Carter, 376 F.Supp. 334, 342 (S.D.N.Y.1974). Consequently, appellant's claim of breach of duty under the Act is properly before the court.

■ We have found nothing in the structure or legislative history of the Investment Company Act which indicates that Congress meant to remove the question of how best to use the brokerage generated by portfolio transactions from the informed discretion of the independent members of a mutual fund's board of directors. Nor do the opinions in Fogel and Moses suggest that the Act compelled recapture of commissions for the Fund's direct cash benefit as a matter of law.

It is true that, in response to the management's argument that even if recapture were practical the directors still had a right

to choose between recapturing of give-ups for the fund's direct benefit and awarding them to brokers for its indirect benefit, the Moses court stated that "if recovery was freely available to [the fund], the directors had no such choice." 445 F.2d at 374. This conclusion, however, was based solely on the First Circuit's interpretation of that fund's charter as mandating recapture, see supra at 415–416, and not upon the fiduciary obligations imposed under the Investment Company Act. When the question of the fiduciary duty of the investment adviser under the Act was addressed in Moses and Fogel, the inquiry of both courts was into the adequacy of the disclosure of the possibilities of recapture by the managers to the independent directors of the mutual fund. Plainly, such full and effective disclosure was required so that the independent directors could exercise informed discretion on the question of recapture vel non, thus performing the watchdog function envisaged for them by Congress.[22] See, e. g., Moses v. Burgin, supra, at 383; Fogel v. Chestnutt, supra, at 749–50. The violation of section 36 perceived in both cases resulted from management's failure to disclose sufficiently to the independent directors the possibilities of recapture, and not from the breach of an absolute duty to recapture imposed by the Act.

While we thus conclude that the Investment Company Act did not remove the recapture decision from the discretion of the Fund's board of directors,[23] such discretion is by no means unrestrained. As previously mentioned, independent directors can perform their function under the Act only

---

**21.** Tanzer v. Huffines, 314 F.Supp. 189 (D.Del. 1970); Brown v. Bullock, 194 F.Supp. 207 (S.D. N.Y.), aff'd, 294 F.2d 415 (2d Cir. 1961).

**22.** We note that after observing that "a change from independent brokerage to an affiliated broker is not a matter to be lightly undertaken," 445 F.2d at 374, the Moses court stated that sound business reasons supported the judgment of the fund's directors that portfolio transactions should not be executed through an affiliated broker. 445 F.2d at 375. See also Schlusselberg v. Colonial Management Associates, Inc., 389 F.Supp. 733, 737 (D.Mass.1974). The Moses court also rejected the contention

that it was unlawful to allocate "reciprocals" to unaffiliated brokers "in proportion to their success in selling . . . shares to the public," so long as the mutual fund obtained best execution. 445 F.2d at 372 n. 5.

**23.** In her supplemental brief, appellant somewhat surprisingly states that

it has never been plaintiff's contention that Section 36 (or Section 36(a), as amended) removes the question of recapture as a matter of statutory law from the ambit of directors' discretion.

when they exercise informed discretion, and the responsibility for keeping the independent directors informed lies with the management, i. e., the investment adviser and interested directors. *See, e. g.,* 15 U.S.C. § 80a–15(c). This responsibility is particularly pressing when the matter in question is one on which the interests of the management and the mutual fund may be at odds. As stated by Judge Aldrich in *Moses*:

> Whatever may be the duty of disclosure owed to ordinary corporate directors, we think the conclusion unavoidable that Management defendants were under a duty of full disclosure of information to these unaffiliated directors in every area where there was even a possible conflict of interest between their interests and the interests of the fund. This duty could not be put more clearly than was stated by the SEC in 1965.
>
> "The Investment Company Act's requirement as to unaffiliated directors, if its purposes are not to be subverted, carries with it the obligation on the part of the affiliated directors, and the investment adviser itself, to insure that unaffiliated directors are furnished with sufficient information so as to enable them to participate effectively in the management of the investment company." Imperial Financial Services, Inc. CCH Fed.Sec.L.Rep. ¶ 77,287 at 82,464 (SEC 1965).
>
> Except where it may be fairly assumed that every unaffiliated director will have such knowledge, effective communication is called for. And, in testing that assumption, it must be borne in mind that they are not full time employees of the fund and it may be—as with Fund's unaffiliated directors—that neither their activities nor their experience are primarily connected with the special and often technical problems of fund operation. If management does not keep these directors informed they will not be in a position to exercise the independent judgment that Congress clearly intended. The only question can be whether the

matter is one that could be thought to be of possible significance.

445 F.2d at 376–77.

*Fogel* recognized that PPI had raised such a question which "could be thought to be of possible significance" and on which the interests of a mutual fund and its adviser were in clear conflict. 533 F.2d at 749. Consequently, the investment adviser was obliged to disclose fully in order to assure that the independent directors supplied an independent check on management and adequately represented and protected the shareholder in fund decisions. Assuming such disclosure, Judge Friendly concluded that

> [the] minimum requirement to enable the Fund's independent directors to discharge these duties with respect to recapture was a careful investigation of the possibilities performed with an eye eager to discern them rather than shut against them, and, if these possibilities were found to be real, a weighing of their legal difficulties and their economic pros and cons. . . .
>
> If this had been done and the independent directors had concluded that, because of legal doubts, business considerations or both, the Fund should make no effort at recapture, we would have a different case. But when there has been inadequate communication to the independent directors, it is no defense to the Adviser and those exercising control over it that a decision not to recapture, taken after proper communication, would have been a "reasonable business judgment."

533 F.2d at 749–50 (footnotes omitted).

■ Thus the decision to forego recapture here did not violate the fiduciary obligations of either the Fund's adviser or directors under section 36 of the Investment Company Act if the independent directors (1) were not dominated or unduly influenced by the investment adviser; (2) were fully informed by the adviser and interested directors of the possibility of recapture and the alternative uses of brokerage; and (3) fully aware of this information, reached a reasonable business decision to forego re-

capture after a thorough review of all relevant factors.[24] We now turn to the record in this case to see if these conditions were met.

\*   \*   \*   \*   \*   \*

The documentation of the disclosure to the independent directors on the subject of recapture begins with the issuance of PPI by the SEC on December 2, 1966. Copies of the report were distributed to the directors of the Fund, as was a December 5, 1966 memorandum from M&D assessing PPI's impact. This memorandum pointed specifically to the SEC proposal to preclude give-ups. It was followed almost immediately, on January 9, 1967, by a second memorandum from M&D to the directors. M&D there noted that "Chemical Fund's turnover rate is substantially below not only the mutual fund average but the average rate for the entire Stock Exchange," and made the following summary of the PPI proposal to prohibit give-ups:

> We believe, therefore, that the recommendations of the SEC would benefit both funds in that the volume discount would reduce the cost of operation and the elimination of give-ups would make the funds more competitive from a sales standpoint since they would be purchased on a performance basis rather than a reciprocal business basis, a practice in which Chemical Fund has not been competitive with the industry because of the low amount of brokerage commissions available. *The SEC apparently looks with favor on the practice of using brokerage business on portfolio transactions to reduce the cost of management.* It strongly endorses the method of operation of the Broad Street complex in which the partners of J. & W. Seligman receive substantial profits from the brokerage business carried out for the investment companies in that complex. It does not refer in this connection to the risks of excessive portfolio turnover nor to the pending derivative stockholder suits

against this complex based on the theory that the funds could save money by using the third market or direct trades. The Report also points out that IDS is now a member of the Pacific Coast Exchange with the fund receiving the full profit on this brokerage business and the fact that the United Fund Group is also a member of the Pacific Coast Exchange with the fund receiving 50% of the profit. They refer to the fact that the brokerage subsidiaries do substantial amounts of Pacific Coast Exchange business for brokers who execute orders for the funds on other exchanges. (emphasis added).

The memorandum ended with a recommendation that the fund "continue the practice of using give-ups until such time as the SEC or Congress shall rule against that practice."

By October 17, 1967, M&D determined that in order to help formalize the board's annual consideration of the management and distribution contracts, it would prepare a memorandum outlining the comparative performance record of the Fund, comparative cost of operation, and the use of brokerage commissions to secure sales, research, and other services. M&D was by then fully aware, because of actions taken by both the SEC and competitor funds, that the board of directors itself should consciously make the decision whether or not to recapture.

Consequently, at the November 29, 1967 board meeting of the Fund, the chairman, the late Ferdinand Eberstadt, suggested that the independent directors consider appointing a subcommittee to review the operations of the Fund and M&D with a view toward reporting to the board prior to its next consideration of renewal of the management and distribution agreements. The independent directors chose from their number a subcommittee consisting of Dr. Murray and Mr. Dorsett to conduct such a review of operations.

---

**24.** This is the test proposed by the SEC, and we find that it encompasses both the *Moses* test of the adequacy of the disclosure of the possibilities of recapture by the adviser to the independent directors, and the *Fogel* test of the "minimum requirement" for the discharge of the independent directors' duties after such disclosure has been made.

On January 26, 1968, SEC Securities Exchange Act Release No. 8239, announcing proposed rule 10b–10 which would have mandated recapture when possible, see *supra* at p. 408, was issued. The subcommittee of the Fund's board reviewing operations, Murray and Dorsett, then requested Sullivan & Cromwell, counsel to the fund, and also to Eberstadt and M&D, to review the Fund's brokerage practices.

Sullivan & Cromwell responded with an opinion letter to the board dated February 20, 1968, which follows in its entirety:

You have asked us to review the method by which F. Eberstadt & Co., Managers & Distributors, Inc. (the "Manager") places brokerage orders for Chemical Fund, Inc. (the "Fund") and directs the allocation of a portion of the brokerage commissions arising therefrom to brokers other than the broker executing the order. As you know, F. Eberstadt & Co., the sole stockholder of the Manager, became a member of the New York Stock Exchange in 1962 and, since that time, as a matter of policy, has not executed brokerage orders for the Fund or requested or received "give-ups" on business done for the Fund by other brokers on the New York or other stock exchanges.

We have reviewed Securities Exchange Act Release No. 8239, dated January 26, 1968, which discusses, among other things, the level and structure of commission rates on the New York Stock Exchange, the practice of reciprocity and "give-ups", and the possibility of a manager receiving commissions or "give-ups" in connection with a fund's portfolio transactions in reduction of the management fee by all or a portion of such brokerage commissions or "give-ups". The Release also proposes the adoption of Rule 10b–10 under the Securities Exchange Act of 1934. We understand that you have received a copy of this Release. We have also examined the Investment Company Act of 1940 and such other matters of law as we have considered appropriate.

On the basis of the above and assuming that the Board of Directors has considered all the relevant facts concerning this matter, including the possibility of adopting alternate methods of handling the Fund's brokerage business whereby a portion of the commissions might be used to reduce the management fee, and assuming further that, as a result of such consideration, the Board of Directors has come to the conclusion as a matter of reasonable business judgment that it is in the best interest of the Fund and its shareholders that the continuation of the present method of placing brokerage orders and directing "give-ups" be approved, it is our opinion that such approval would be lawful.

The board of directors of the Fund met on February 21, 1968, and the subcommittee previously appointed to review the operations of the Fund and M&D prior to the board's consideration of the management and distribution agreements submitted its report in writing. In this and subsequent years M&D furnished this subcommittee with copies of its financial statements for several preceding years, and various schedules comparing the expenses of M&D with other publicly owned companies in the field and the Fund's performance and expense ratio with those of certain other common stock growth funds. M&D also reviewed with the subcommittee the amount of portfolio brokerage commissions and the method of allocating such commissions. In addition, the subcommittee considered the opinion letter of Sullivan & Cromwell regarding the various matters referred to in SEC Securities Exchange Act Release No. 8239.[25]

The Murray/Dorsett report went into a lengthy consideration of what use should be made of brokerage commissions:

In Release No. 8239 dated January 26, 1968, the SEC discusses the level and structure of commission rates on the New York Stock Exchange, the practice of reciprocity and "give-ups" and the possibility of a manager receiving commissions or "give-ups" in connection with a fund's

---

**25.** Copies of the release and opinion letter were forwarded to each director.

portfolio transactions in reduction of the management fee by all or a portion of such brokerage commissions or "give-ups". We have studied this Release and the proposal to issue Rule 10b–10 on the subject of give-ups and we also read the opinion of Messrs. Sullivan & Cromwell addressed to the Board of Directors of Chemical Fund dated February 20, 1968 dealing with this subject.

In 1967, as fully disclosed in the proxy statement, the Fund paid brokerage commissions of $618,000. Of this amount $510,000 was allocated to dealers based on the volume of Fund shares sold. The allocation of brokerage business and the use of directed give-ups can be regarded as additional compensation to dealers who sell Fund shares. This is a long established practice of the business, which has been followed by Chemical Fund with the full knowledge of the Board and the stockholders. In addition to the information regularly provided in proxy statements, prospectuses and Form N–1R, the manager has reported from time to time and the Board has approved these practices. The specific allocations to individual brokers are made by the fund's officers without prior review by the directors but in accord with the general policy approved by the Board.

We quote from the SEC release as follows: "Many mutual fund managers believe that so long as this type of sales incentive can be given to dealers, competition among mutual fund managers for the favor of dealers will make it difficult, if not impossible, for any individual fund manager to fail to provide such compensation to dealers, both members and non-members of exchanges, selling shares of his funds." We agree completely with this statement. Regardless of the merits of this method of doing business, it is not practical to attempt a change for Chemical Fund at this time even though we recognize that it would be possible to request the manager to execute some portfolio transactions as a member of the New York Stock Exchange or request give-ups on portfolio transactions which would be credited against the amount of the management fee.

We believe that the directors must look upon this question realistically and in proper perspective. Chemical Fund has a very low portfolio turnover rate. The Board retains close control over that rate of turnover. We are mindful of the fact that through the portfolio committee as presently constituted the unaffiliated directors have, in effect, power over portfolio transactions and this power has been frequently exercised. Therefore, management does not really exercise complete control over the generation of commission business for the purpose of stimulating sales. While we recognize fully that allocation of the purchase and sale orders is an additional resource to the distributor, we are not impressed with either its size or the possibility of abuse. We propose therefore, no change in this arrangement and recommend approval of a continuation of the past practice of leaving the allocation of brokerage commission business to the officers of the Fund.

The report concluded by recommending renewal of the existing contracts for another year.

The interested directors withdrew from the meeting during the discussion of the management and distribution agreements. After discussion, the board, with only independent directors voting, unanimously approved the continuance until March 31, 1969 of the existing management and distribution agreements.

At a board meeting on July 17, 1968, Dr. Murray made reference to hearings being conducted by the SEC with respect to the level of NYSE commission rates and the use of give-ups by mutual fund managers and distributors. He reminded the board that this subject had been dealt with in the February 21, 1968 subcommittee report, and stated that he saw no reason to make any change in the practice of leaving the allocation of brokerage business to the officers of the Fund, as recommended in that report. After discussion, the unaffiliated directors

again unanimously approved the continuation of this practice.

On December 5, 1968, the constitution of the NYSE was amended to prohibit customer directed give-ups. In a cover letter dated January 10, 1969 which accompanied the material furnished for the annual review of operations, Francis S. Williams, then chairman of M&D, informed the Murray/Dorsett subcommittee that the use of give-ups was abandoned on December 5, 1968 to conform to the new NYSE stance. He also suggested to the unaffiliated directors that it was in the best interests of the Fund and its shareholders

> to have the Manager direct the brokerage business in such a way as to obtain the best price and execution. However, in selecting such brokers the extent to which such dealers have sold shares of the Fund or have provided statistical and research information will continue to be important factors.

The subcommittee's written report of February 19, 1969 accepted this recommendation.

The cover letter from M&D of January 9, 1970 and the subcommittee's report of January 22, 1970 were similar to their 1969 counterparts,[26] and basically recommended continuation of existing policies. At a board meeting on February 18, 1970, the unaffiliated directors, relying on this subcommittee report, unanimously adopted a new management agreement and approved the continuance of the existing distribution agreement.

The cover letter of January 15, 1971 accompanying the material furnished by M&D to the subcommittee to review operations stated that a summary of Judge Wyzanski's district court opinion in *Moses v. Burgin, supra,* had been recently distributed to the board of directors. The district court there held that the decision to recapture or not was a matter of business judgment for the board of directors, and that the board members did not breach their fiduciary

duties by permitting portfolio brokerage to be used to acquire statistical information and assist sales—provided that best execution was obtained. The letter pointed out to the subcommittee the possibility of recapture, but recommended that the unaffiliated directors continue the current use of brokerage commissions. The subcommittee to review operations, which now consisted of Murray and Driscoll, prepared a written report to the board dated February 17, 1971 which recommended no change in the method of directing brokerage business. It noted that, because of a relatively low rate of portfolio turnover, the volume of commissions paid was small for a mutual fund of Chemical Fund's size, and reasoned that

> [w]ith so many proposals under discussion regarding negotiated commission rates, institutional membership, and the possibility of "unbundling," we believe that it would be unwise to alter present arrangements.

The report also suggested, however, that the subject of brokerage allocation "be reviewed promptly in light of any developments during the year."

At the board meeting of June 16, 1971, the chairman, Williams, referred to the First Circuit's decision in *Moses v. Burgin,* copies of which had been previously mailed to the directors. Copies of the Sullivan & Cromwell opinion letter dated February 20, 1968 were again distributed to the board at the meeting. Williams suggested that in the light of Judge Aldrich's decision it would be advisable to appoint a committee of unaffiliated directors to again review the Fund's practices with respect to brokerage, to consult with Sullivan & Cromwell regarding brokerage practices, and to consider the various alternatives available. A committee of independent directors, consisting of Dr. Murray as chairman, Driscoll, and Fox, was then appointed.

On July 21, 1971, Robert C. Porter, then president of the Fund, reported to the board that a meeting had been scheduled

**26.** In the interim, SEC Securities Exchange Act Release No. 8746, the Loomis letter stating that management has no fiduciary duty to acquire a stock exchange seat for recapture purposes if its best business judgment is to the contrary, *see supra* at 408, had been issued.

with the NYSE to explore the question of whether it would be permissible, if the Fund did some of its brokerage business with Eberstadt as a member of the Exchange, to credit a portion of the commissions against the management fee payable by the Fund. He also reviewed a proposed settlement, involving recapture by means of executing portfolio transactions on regional exchanges, in a case against two other funds.

On July 30, 1971, Porter received from David D. Huntoon, assistant vice-president and associate director of the NYSE, a proposed "Educational Circular" stating the Exchange's position on using commissions to reduce investment advisory fees. In essence, the circular stated that this was not a prohibited rebative practice "to the extent that the investment advisory fee is for investment advice or other services routinely covered by commissions." The letter from Huntoon accompanying the proposed educational circular stated that a meeting could be arranged to discuss the circular's contents.

On August 5, 1971, "*The Securities Markets* A Report, With Recommendations" by William McChesney Martin, Jr. (the Martin Report), was submitted to the Board of Governors of the NYSE. This study, in sharp contrast to existing NYSE practice as illustrated by the July 30, 1971 proposed Educational Circular, recommended prohibition of member firm management of mutual funds as well as institutional membership, and prohibition of crediting commissions against any fee charged for investment advice. Martin Report at 25.

The Martin Report thus added several more pieces to the recapture puzzle. M&D sent a memorandum to the subcommittee appointed to review the Fund's brokerage practices on August 17, 1971. It indicated that management was still reviewing with the NYSE the permissibility under its rules of using a portion of brokerage commissions to reduce advisory fees, and that Sullivan & Cromwell was exploring the possibility of working out such an arrangement through the Pacific Coast Stock Exchange or other

regional stock exchanges by means of some form of preferred rate arrangement for NASD members. It also raised several other "unsettled" factors for the subcommittee's consideration:

1. The Martin report has just been issued and recommends that members of the NYSE spin-off the management of investment companies from the brokerage business.

2. The 1970 amendments to the Investment Company Act directed the NASD to consider the scale of distribution fees for registered investment companies and this study is now in progress.

3. The present commission rate structure of the NYSE is now under review by the SEC.

4. The effect of negotiated commissions is still not fully developed and the question of whether the $500,000 level will be reduced to a substantially lower level is still to be determined.

5. The language of the Fidelity Management case [*Moses v. Burgin* ] indicated that the directors may have no choice in these matters because of charter provisions and the question of whether the Certificate of Incorporation can be amended to give the directors such a choice is now being considered by counsel.

It concluded by expressing M&D's recommendation that the explorations of recapture arrangements with the NYSE and regional exchanges be diligently pursued, but that no final decisions changing the methods of distribution or handling brokerage business be made until some of the quoted uncertainties were clarified.

On December 13, 1971, M&D furnished the subcommittee to review operations, which now consisted of Murray and Coles, with its annual compendium of information on the Fund's performance. The cover letter indicated that Sullivan & Cromwell's research into the fifth "unsettled" factor resulted in its recommendation that the Fund's certificate of incorporation be amended "to make explicit the powers of the Board of Directors with respect to the

determination of how portfolio brokerage of the Fund shall be used." It stated that the proposed amendments incorporated the board's policy of refraining from recapture—despite its recognition of available recapture techniques.

At a board meeting held on December 15, 1971, it was reported that a number of mutual fund management companies were currently obtaining preferred rate non-member status on regional stock exchanges in order to recapture part of the portfolio brokerage commissions for the benefit of their funds. It was pointed out that several lawsuits against management companies over brokerage practices were being settled on the basis that part of the portfolio brokerage would be recaptured through a NYSE affiliate of the manager or through preferred rate non-member status on a regional exchange. It was also stated that the SEC was expected to announce its position on this matter early in 1972 after the conclusion of hearings in Washington.

At the annual meeting of the Fund held on March 14, 1972, the stockholders were asked

> to consider and vote upon a proposal made by the Board of Directors to amend the Amended Certificate of Incorporation of the Corporation to clarify provisions thereof as to the powers of the Board of Directors in the allocation of portfolio brokerage for the Corporation.

By vote of a wide margin of the outstanding shares entitled to vote, a resolution so amending the certificate was adopted.[27] A proposed amendment to the management agreement providing that no brokerage business could be done with the firm of F. Eberstadt & Co. Inc. without the specific approval of a majority of the unaffiliated directors also carried.

The record shows that this pattern of periodic consideration of the recapture question continued during the remainder of 1972 and in 1973 and 1974, with the possibility of recapture being raised by M&D, con-

---

27. As amended, Section B of Article Eighth of the Amended Certificate of Incorporation provided the board of directors with the power:

> 8. To determine in their [sic] discretion the manner and purposes of the allocation of brokerage commissions to be paid by the Fund and the selection of the brokers and dealers that shall receive or share directly or indirectly in any such commissions and the basis of such receiving or sharing therein, including, but not limited to, sales of shares of the Fund and any other funds having the same investment adviser and statistical and other information and wire and other services provided to the Fund or the Manager.

The proxy statement dated January 27, 1972 stated that the purpose of this amendment was to make explicit that which has always been implicit, namely, that the Board of Directors of the Fund (more than 50% of whom are otherwise unaffiliated with the Fund or its Manager) has the power to determine how the portfolio brokerage of the Fund shall be used. In the opinion of the Board of Directors of the Fund, it is in the best interest of the Fund to continue the brokerage practices which it has followed since inception under which all portfolio transactions have been carried out by brokers who are not affiliated with the Manager and Distributor of the Fund and not to make any provision for recapture through an affiliated broker of any part of the brokerage commissions paid by the Fund.

Accordingly, as reflected in the proposed new Management Agreement discussed below, the Board of Directors has directed the Manager not to have the Fund purchase or sell any portfolio securities through the firm of F. Eberstadt & Co., Inc., the parent of the Manager, which is a member of the New York and American Stock Exchanges. As indicated under "Allocation of Portfolio Brokerage and Portfolio Turnover Rate" below in this proxy statement, the Fund's Board of Directors and the Manager consider that, subject to obtaining the best price, execution and commission, allocation of brokerage to dealers who have sold shares of the Fund or have provided statistical and research information has been and presently continues to be of benefit to the Fund and its shareholders. The Fund's Manager has been authorized by the Board of Directors to select in the Manager's discretion the brokers or dealers that shall execute portfolio transactions or share directly or indirectly in commissions with respect thereto, and to determine the basis of such sharing, subject in each case to obtaining the best execution taking into consideration, among other things, price (including any brokerage commission), size of the transaction and need for speed in execution. The Board, of course, would have the right to determine in the future that some other course of action might be desirable.

sidered by the subcommittee of independent directors, and finally rejected by the independent directors as a whole.

Testimony elicited at trial to a large extent repeated what was already reflected in the documentary evidence. Certain gaps were, however, filled in.

Zeller testified that as early as the latter part of 1962 the possibility of offsetting give-ups against the management fee was "discussed and discussed with the board." He stated that the subject was thereafter "reexamined at least once a year, and I think oftener [sic]."

The main theme running throughout Zeller's testimony was that because of the Fund's relatively low portfolio turnover rate during the period of time covered by the complaint and throughout its history, it had less brokerage to allocate than its competitors and consequently was "at a very great disadvantage in getting sales cooperation, research cooperation, statistical information . . . ." He continued:

Now, whether it was better to use that brokerage for those purposes or whether it was better from the standpoint of the stockholders to use some part of that brokerage to reduce the management compensation payable to Eberstadt was the closest kind of business decision, and it was made in favor of using the brokerage to protect the kind of performance that Chemical Fund has had since its inception.

Dr. Murray testified that the brokerage policy of the Fund, determined specifically by the independent directors, was to delegate to the manager the specific allocation of commission business within guidelines established by the board of directors. Those guidelines were that the manager was at all times to "seek best execution for the purchase or sale transaction," and that, subject to that overriding consideration, it was encouraged to use brokerage commission business prior to mid-1973 to stimulate sales of Fund shares, and, throughout the entire period,

to secure statistical and other services and to obtain investment information, in-

vestment research recommendations from the broker-dealer community.

When asked how many times methods of recapture of brokerage commissions were discussed by the Fund's board, Murray replied:

I don't believe I could accurately estimate the number of occasions, but, obviously, they were discussed annually at the time when we discussed renewal of the management and distribution contract, and then in between, as whenever we read or heard about or talked about some of the changes in or suggested changes in the regulatory environment or in legal decisions. So that there must have been three or four more other times a year in which these questions would be formally discussed at board meetings or at portfolio committee meetings or at the luncheon table.

He then enumerated the reactions of the board to specific regulatory and legal developments, including its view that it did not wish to follow the proposals made in the SEC release accompanying proposed rule 10b-10, its consultation with counsel to confirm the propriety of this view, and its subsequent satisfaction at the withdrawal of the proposed rule 10b-10 and what it perceived as a complete retreat by the SEC from its former position.

Murray testified at length concerning his reasons for being "unalterably opposed" to having Eberstadt act as broker for the Fund or receive give-ups on its behalf. He stated that it "opened up the possibility of a conflict of interest situation" in which Eberstadt traders would have to choose between giving priority to the orders of the Fund or one of their other customers. He also saw conflict of interest problems in negotiating commissions at arm's length when a parent and subsidiary were both involved in a transaction.

Murray referred to a possibility that if Eberstadt alone were used to execute Fund portfolio transactions, other brokers might anticipate the Fund's investment decisions. He also said that if brokerage business were

given exclusively or predominantly to Eberstadt,

> other broker-dealers would have no incentives to seek out the opportunity to perform services for Chemical Fund, to provide it with investment information, to provide it with statistical and other kinds of services that would be of assistance in the management of the portfolio.

Moreover, he asserted, up until mid-1973 brokerage allocations had been instrumental in producing the sales of new shares and accompanying positive cash flow. Murray viewed these as vitally important to the quality of performance of the Fund because they eliminated any need for untimely liquidation of portfolio investments in order to meet demands for redemption of existing shares.

The reputation of the Fund would also have been damaged by placing its commission business with Eberstadt or having Eberstadt receive give-ups on the Fund's behalf, according to Murray. Investors and the public would suspect churning of the portfolio in order to generate an enlarged volume of commission business.

Finally, Dr. Murray pointed to the "overriding consideration that the commission structure was not there to stay." He reasoned that

> under these circumstances, it would be an especially foolish step for the directors of Chemical Fund to take to impair the effectiveness of the ongoing organization for what was obviously going to be an extremely short-lived and temporary minor dollar saving to the fund . . . .

Murray confirmed that the board had considered preferred rate non-member status on regional exchanges, but that he had decided, prior to learning that this method of recapture was available, that it should not be used because placing portfolio transactions on regional exchanges "would damage . . . best execution." His reasoning became evident in the following exchange:

> The Court: Dr. Murray, . . . I want to be sure I understand the purport of your testimony. Were you as convinced that the giving of the execution contract to Eberstadt and obtaining give-ups from them would be so disadvantageous for the various reasons that you set out that you would not do so, unless you were convinced that you were compelled to do it by some rule or regulation of law? That is what I glean from your testimony. Is that correct?
>
> The Witness: That is precisely an accurate statement, sir. I think that exactly follows the thread of what I have been trying to say, and that is the reason why, for example, I was not interested in pursuing some of these avenues, because I had decided no matter what the avenue permitted, we should not do it in this Fund.

The testimony of Bertrand Fox, another independent director, corroborated that of Dr. Murray and enumerated basically the same reasons for foregoing recapture.[28]

### (1)

As previously mentioned, it was stipulated by the parties that during the period in question a majority of the Fund's board of directors was neither "affiliated" nor "interested" within the meaning of the Investment Company Act. At the trial, appellant never seriously challenged the factual independence of these directors from M&D.

The record shows that while the independent directors received information on the possibilities of recapture and recommendations against it from M&D, all such material was presented in a neutral, even-handed fashion. *Contrast Fogel v. Chestnutt, supra; Papilsky v. Berndt,* 71 Civ. 2534 (S.D. N.Y., decided June 24, 1976).

The evidence demonstrates that the independent directors separately considered

---

28. The testimony of Dorsett, a third independent director who was called in rebuttal by the plaintiff, shed little light on the board's deliberations.

the subject, investigated it by way of their subcommittees, and arrived at their own conclusion that recapture should not be undertaken. This was a well-qualified board and its determinations did not merely rubber-stamp the recommendations of M&D. We conclude that the independent directors were not dominated or unduly influenced by the investment adviser.

### (2)

In his opinion below, Judge Carter found that "[t]here is no evidence of nondisclosure by M&D to the unaffiliated directors in this case . . . ." 399 F.Supp. at 950. This finding of fact is fully supported by substantial evidence.

The record demonstrates that M&D promptly brought every administrative, judicial, and legislative development pertaining to recapture to the attention of the Fund's board, including its independent directors. Such communication was "full" and "effective" under the *Moses* test, *see supra* at p. 418, which governs disclosures by management to the fund when the interests of the two may conflict. The independent directors were fully aware early in the game that recapture was possible by having Eberstadt either execute portfolio transactions or receive give-ups, or by resort to a regional exchange technique, and we conclude that the second prong of the applicable test—that the independent directors were fully informed by the adviser and the interested directors of the possibilitity of recapture and the alternative uses of brokerage—has been met.

### (3)

There remains the question of whether, under the standards laid down by Judge Friendly in *Fogel, see supra* at p. 418, the independent directors reached a reasonable business judgment to forego recapture after being informed of all relevant factors and thoroughly reviewing them.

There were four principal business reasons which convinced the independent directors to forego recapture.[29] These reasons were (1) that recapture would have involved the Fund in conflicts of interest in fact and in appearance; (2) recapture would have an adverse impact on the sale of the Fund's shares; (3) it was in the best interests of the Fund to allocate brokerage for research; and (4) imminent changes in the structure of the securities industry made it unwise to change the Fund's longstanding brokerage policies against recapture.

The directors' view that recapture would have involved the Fund in conflicts of interest in fact and in appearance was based on several factors. It was feared that shareholders would suspect churning if the Fund used an affiliated broker to recapture and that consistent use of Eberstadt to execute portfolio transactions might permit other investors to anticipate Fund investment decisions. There was also concern that best execution would suffer if an affiliate were used as executing broker.

While the prospects of suspected churning and anticipation by others of Fund investment decisions were remote, they were not unreasonable apprehensions. Moreover, there was a real possibility that the obligation of obtaining the best execution might be jeopardized through close affiliation between a broker-dealer and the investment company,[30] and that possibility alone could warrant ruling out such a method of recapture. We note also that concern with eliminating any unnecessary appearance of conflicts of interest in an area already "fraught" with them, *Galfand v. Chestnutt Corp., supra,* 545 F.2d at 808, is not an unreasonable supplementary business consideration.

The directors also feared that recapture would have an adverse effect on the sale of the Fund's shares. The question of how large a fund should become by increasing its sales is highly debatable. *Fogel v. Chestnutt, supra,* at 756 n.33. The PPI

---

**29.** *See* discussion of Dr. Murray's testimony, *supra* at pp. 425–426.

**30.** This possibility was recognized as early as 1966 in the PPI Report. *See* PPI at 189–90.

report acknowledged that competitive considerations relative to sales might argue against recapture. Such considerations were stronger in the case of funds which, like Chemical Fund, had relatively low rates of portfolio turnover and thus little brokerage available for distribution as sales incentives in the first place. In addition, the directors felt that proceeds from new sales were needed to avoid untimely portfolio liquidations and that, since there are economies of scale in managing a portfolio, an increase in the size of the fund would decrease the management costs per dollar. The board's conclusion that recapture might decrease the sale of shares and eventually harm the Fund's performance was reasonable.

The directors' judgment to continue the existing practice of allocating brokerage to obtain additional research was also reasonable. That general practice was confirmed in the Policy Statement of the SEC on the Future Structure of the Securities Market (February 2, 1972), 37 Fed.Reg. 5286, 5290. See also SEC Securities Exchange Act Release 9598 (May 9, 1972), containing an interpretation of the Future Structure policy statement on this point. Moreover, section 28(e)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(e)(1), which was added by the Securities Act amendments of 1975, permits an investment adviser to cause an account to pay a broker an amount of commission for effecting a securities transaction in excess of the commission another broker might have charged, as long as the adviser determines in good faith that the commission was reasonable in relation to the value of both the brokerage and research services provided by such broker.

Finally, the view of the directors that imminent changes in the structure of the industry made it unwise to change the Fund's brokerage policies may not be entitled to much weight. Nevertheless, in the light of the many and often contradictory administrative, legislative and judicial pronouncements on the subject of recapture, this is a factor to be taken into account when evaluating the reasonableness of the business judgment reached by the directors—which they recognized as a very close question.

The independent directors also sought the advice of counsel on the recapture question. It is true that such advice was not given by wholly disinterested counsel since Sullivan & Cromwell represented M&D and Eberstadt as well as the Fund itself. Thus, "it would have been . . . better to have the investigation of recapture methods and their legal consequences performed by disinterested counsel furnished to the independent directors." Fogel v. Chestnutt, supra, at 750. Here, however, counsel correctly advised the independent directors as to the applicable law and the necessity for reaching a reasonable business judgment on the recapture question. The fact that counsel were not disinterested does not vitiate the reasonableness of the judgment which the independent directors reached here. See Fogel v. Chestnutt, supra, at 749–50.

In its amicus brief, the SEC, although critical of some of the reasons advanced for the decision not to recapture, concluded that the reasons considered in the aggregate supported the directors' decision. Among the reasons which the SEC considered valid were the desirability of obtaining additional research, the possibly adverse effect of adopting a recapture policy on sales and on portfolio performance, and the requirement of obtaining the best execution.

It should be borne in mind that the question here is not whether, as a matter of hindsight, the determination of the independent directors was correct. The question is whether the decisions by these directors to forego recapture were reasonable considered at the time and under the circumstances in which they were reached.

We conclude that the Fogel test governing the determination of the independent directors not to recapture was satisfied in this case. There was full disclosure by the Fund's adviser as to the possibilities of recapture and the methods available to accomplish it. All material dealing with the question was placed before the independent

directors and fully considered by them. They were correctly advised by counsel as to the applicable legal standards. They carefully weighed the relative advantages and disadvantages of recapture and the economic pros and cons involved. Their decision to forego recapture was a reasonable business judgment.[31]

Since all three prongs of the applicable test have been met, we agree with Judge Carter that the decision to forego recapture did not violate the fiduciary obligations of either the Fund's adviser or its interested directors under section 36 of the Investment Company Act, and affirm his holding to that effect.

## D.

Appellants' final contention is that the court below erred in not holding M&D, Eberstadt and Zeller liable to the Fund for the issuance to its shareholders of false and misleading proxy statements and prospectuses. In this derivative action, brought on behalf of the Fund, we see no basis upon which the Fund could recover for deficiencies in its prospectuses. We will, therefore, treat this contention as attacking only the adequacy of the proxy statements. *See*

*Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Galfand v. Chestnutt Corp., supra.*

It is charged that proxy statements issued to the Fund's shareholders omitted to state material facts as to the opportunities to recapture portfolio brokerage commissions for the benefit of the Fund, the methods available for such recapture, and the board's decisions to forego recapture. The material facts so omitted, says the appellant, were necessary in order to make the proxy statements not false and misleading within the meaning of SEC rule 14a–9, 17 C.F.R. § 240.14a–9(a), as made applicable to investment companies.[32]

The question of the adequacy of the information furnished to shareholders in proxy statements is not disposed of by our holding that the defendants did not breach their fiduciary duties relative to the decisions of the independent directors to forego recapture. The management of an investment company also is obliged under rule 14a–9 to furnish its shareholders with all information necessary to enable them to make an informed judgment on questions concerning investment contracts presented to them at annual meetings. *See Galfand*

---

**31.** There is an important distinction between the case at bar and this court's recent decision in *Arthur Lipper Corp. v. SEC,* 547 F.2d 171 (2d Cir., 1976). Here, the Fund's independent directors decided to use excess brokerage commissions generated by portfolio transactions to secure additional sales promotion, research, and other services. They recognized, when negotiating the management and distribution contracts, that this might provide M&D with some incidental advantages, but concluded that this use of brokerage would confer greater benefits on the Fund than an immediate reduction in the advisory fee. In contrast, the arrangement in *Lipper* "was a bald diversion to the manager of sums belonging to the investment company", *Arthur Lipper Corp. v. SEC, supra,* at 180, with the mutual fund receiving no arguable benefit in return.

**32.** As Chief Judge Kaufman stated in *Galfand, supra,* at n.14:
Rule 14a–9, 17 C.F.R. § 240.14a–9(a) was promulgated by the Securities and Exchange Commission pursuant to § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and provides:

§ 240.14a–9. False or misleading statements.
(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.
The Rule is pertinent here by virtue of Section 20(a) of the Investment Company Act, 15 U.S.C. § 80a–20(a), and the Commission's Rule 20a–1, 17 C.F.R. § 270.20(a)–1, making the proxy rules applicable to securities issued by registered investment companies.
It may be noted that the SEC's amicus brief did not address the issue of the adequacy of disclosure to the shareholders.

*v. Chestnutt Corp., supra,* at 812; *Mills v. Electric Auto-Lite Co., supra,* 396 U.S. at 381, 90 S.Ct. 616. We must therefore examine the various proxy statements to determine whether or not they conform to the requirements of rule 14a–9.

In 1966, 1970, 1971, 1972, and 1973, new investment advisory contracts with M&D or renewals or amendments of existing contracts were submitted for approval by the Fund's shareholders at annual meetings pursuant to section 15(a) of the Act, 15 U.S.C. § 80a–15(a). The shareholders also had the statutory right at any time to terminate the current advisory contract or seek its renegotiation under section 15(a)(3). *Brown v. Bullock, supra,* at 417. In all the years from 1966 to 1974, inclusive, the proxy statements issued for the annual shareholders meetings contained statements concerning the M&D management contract and the Fund's portfolio brokerage practices. Directors of the Fund were also elected by the shareholders annually.

The February 4, 1966 proxy statement, issued before the publication of PPI by the SEC, devoted the following separate section to the subject of Fund brokerage:

> For the year 1965, brokerage fees paid by the Fund on the purchase and sale of the Fund's portfolio securities amounted to $339,860. There is no undertaking or agreement to allocate such business to dealers on any prescribed basis. However, the extent to which such dealers have sold shares of the Fund or have provided statistical research or other services are important factors in such allocation. Subject to obtaining the best execution, $271,910 was allocated to dealers based on the volume of Fund shares sold and $40,977, representing approximate value, to dealers who provided statistical research or other services to the Manager. The Manager has informed the Fund that these services do not reduce the expense of the Manager by a material amount. Officers of the Fund are responsible for the allocation of brokerage business and placement of brokerage orders.

It is the current intention of the Fund to continue the practice set forth above. However, it is the policy of the Fund that no brokerage business will be placed with any dealer if, in the opinion of the Fund the most favorable price and execution would not be obtained.

The February 7, 1967 proxy statement, issued some two months after PPI, and the February 9, 1968 proxy statement, contained brokerage sections nearly identical to the 1966 version except for the specific figures reported.

The February 10, 1969 proxy statement followed this pattern in practically identical language. In addition, it provided information as to the Fund's portfolio turnover rate for the past three years and stated:

> While the Fund does not presently intend to purchase or sell any securities through the firm of F. Eberstadt and Co., it may do so in the future but, if so, only in its capacity as broker with respect to transactions on a securities exchange at regular exchange commissions and charges.

The February 19, 1970 and March 31, 1971 proxy statements were virtually identical to their 1969 counterpart on the subject of portfolio brokerage.

The January 27, 1972 proxy statement contained a separate section proposing an amendment to the Fund's certificate of incorporation designed to make explicit what was said to be the implicit power of the board of directors to determine how portfolio brokerage commissions should be allocated. *See supra* n. 27. The statement announced that the board intended to continue existing brokerage practices and did not plan to

> make any provision for recapture through an affiliated broker of any part of the brokerage commissions paid by the Fund.

This was the first mention of recapture possibilities in any of the proxy statements.

In addition, the 1972 proxy statement contained a somewhat expanded discussion of portfolio brokerage and portfolio turnover rate:

Brokers receive commissions at standard rates on portfolio transactions up to $500,000 and at negotiated rates on transactions in excess of this amount since April 1, 1971. For the fiscal year ended December 31, 1971 brokerage fees paid by the Fund on the purchase and sale of the Fund's portfolio securities amounted to $920,767. The Fund has also executed portfolio transactions with dealers acting as principals in the "third market" and directly with institutions in the "fourth market". The Fund does not deal exclusively with any particular broker-dealer or group thereof. The Fund always seeks to place portfolio transactions where it can obtain the best net price which results from the most favorable combination of price, commission and execution and deals directly with a principal market maker in connection with over-the-counter transactions. The Fund's Board of Directors and the Manager consider that, subject to obtaining the best price, execution and commission, allocation of brokerage to brokers who have sold shares of the Fund or have provided statistical and research information is, and presently continues to be, of benefit to the Fund and its shareholders. In many instances the broker who provides the best execution also provides statistical and research information and also may have sold shares of the Fund. To the extent possible, the Manager selects broker-dealers who have provided a broad range of services to the Fund. It is impossible therefore to determine the precise amount of brokerage that was allocated for any single service. Officers of the Manager, who are also officers of the Fund, are responsible for the allocation of brokerage business and placement of brokerage orders, subject at all times to obtaining the best price and execution. The Fund's portfolio turnover rate, exclusive of short-term notes, for the last three fiscal years was 10.3% for 1969, 12.1% for 1970 and 13.2% for 1971.

As indicated above, the Board of Directors has directed the Manager not to have the Fund purchase or sell any portfolio securities through the firm of F. Eberstadt & Co., Inc., the parent of the Manager. The Board, of course, has the right to determine in the future that some other course of action might be desirable.

The final two proxy statements with which we are concerned, dated February 7, 1973 and February 8, 1974, respectively, reflected the amendment to the Fund's certificate of incorporation in 1972 and the NASD rule change in 1973. They informed the shareholders that the Fund's board had the power, under the certificate of incorporation, to determine brokerage policy; that the board had instructed M&D that sales of Fund shares should not be a qualifying or disqualifying factor in the selection of brokers who executed portfolio transactions; that the choice must be made strictly on the basis of the value and quality of the brokerage services rendered; and that in many instances the brokers selected may have provided statistical and research information and may or may not have sold shares of the Fund. They also repeated the statement that the board had directed M&D not to have the Fund purchase or sell any portfolio securities through the Eberstadt firm, although it had the right to determine some other course of action in the future.

At trial, Zeller testified that the shareholders were not advised that up to 1968 give-ups were being directed to brokers who had not participated in the execution because

it was not considered material. . . . [I]t was simply a matter of rewarding brokers for services furnished through the adviser, through the management, to the fund. Whether that was done directly through the give-up mechanism we did not consider a material item.

In response to a question by the court as to whether the shareholders were advised that it was not the Fund's practice to allow give-ups to Eberstadt, Zeller stated:

No; [they] were not, your Honor, for the very reason . . . that the question

was really whether any brokerage revenues flowed to the parent corporation, you see, and whether they flowed by any give-up or direct order was not considered either by us or our counsel to be sufficiently material to be put in the prospectus. You see, as long as we weren't getting brokerage, there was no disclosure problem. That was our judgment and the judgment of our lawyers. Had we gotten brokerage, then you would have had to disclose that.

Dr. Murray's testimony on disclosure to the shareholders was in substantial accord with that of Mr. Zeller.

In his opinion below, Judge Carter observed that

while the full implications of the [brokerage] policy were not spelled out, the policy was announced to the shareholders in every *prospectus* issued since 1965 (emphasis added).[33]

339 F.Supp. at 953. He found that the January 27, 1972 proxy statement relating to the amendment of the certificate of incorporation and referring to recapture was not false and misleading. Though he apparently held that the disclosure provisions of the federal securities acts had not been violated by the earlier proxy statements, he did not specifically address himself to the question of whether the pre-1972 proxy statements (as opposed to prospectuses) omitted material facts.[34]

In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court formulated the following test for determining the materiality of omissions in proxy statements:

[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.[35]

*Id.,* 426 U.S. at 449, 96 S.Ct. at 2133, 48 L.Ed.2d at 766, (footnote omitted). The Court went on to say that this ultimate determination of materiality requires

delicate assessment of the inferences a "reasonable shareholder" would draw from a given set of facts and the signifi-

---

**33.** As previously noted, *supra,* n. 15, the 1965 *prospectus* stated that brokerage was allocated partly on the basis of Fund shares sold and partly on services rendered. It also included the following passage which did not appear in proxy statements until 1969:

[W]hile the Fund has never purchased or sold any securities through the firm of F. Eberstadt & Co. in the past, it may do so in the future but, if so, only in its capacity as broker with respect to transactions on a national securities exchange at regular exchange commissions and charges.

These statements were substantially repeated in the 1966, 1967, 1968, 1969, 1970, and 1971 prospectuses. The 1972 and 1973 prospectuses reflected the changes in the Fund's certificate of incorporation and in the permissibility of selecting brokers on the basis of sales. They

also indicated that Eberstadt and M&D did not participate in the Fund's brokerage.

**34.** This may well have been because appellant's claims of inadequate disclosure to the shareholders, while raised below, were not framed as clearly as they have been on appeal and were not pressed by appellant as actively as her other claims of liability.

**35.** The Court, citing *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1301–02 (2d Cir. 1973), rejected the test of materiality ("all facts which a reasonable shareholder *might* consider important") applied in *Northway* by the Seventh Circuit as setting too low a threshold, and viewed as misplaced that court's reliance on *Mills v. Electric Auto-Lite Co., supra,* as support for that broad definition of materiality.

cance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.

*Id.*

As previously mentioned, at the annual meetings in the years 1966, 1970, 1971, 1972, and 1973, the shareholders were specifically asked to approve management agreements. During the entire period in question, moreover, the shareholders had the statutory right to terminate or renegotiate the current management contracts under section 15(a) of the Act, 15 U.S.C. § 80a–15(a). In addition, there was an annual election of directors who had the power to continue existing management agreements without further shareholder approval unless the shareholders took affirmative action to terminate or renegotiate them.

During the years from 1965 to 1971, inclusive, the proxy statements issued to the shareholders made no reference to the fact that brokerage commissions were recapturable, the methods available to effect recapture, the board's periodic decisions to forego recapture, or the board's reasons for so deciding. While each of these proxy statements contained a description of the Fund's existing portfolio brokerage practices, the shareholders were not informed of the alternatives to these practices. Specifically, the 1966, 1967 and 1968 proxy statements, while stating the amount of brokerage allocated to promote sales and obtain additional research and statistical material and the intention to continue these practices, made no allusion to the alternative of recapture for the Fund's benefit by directing give-ups to Eberstadt or otherwise, the board's rejection of these alternatives, and its reasons for rejecting them. The addition in the 1969, 1970 and 1971 proxy statements of a reference to the Fund's intention not to do portfolio business through Eberstadt did not explain the significance of this fact or even mention that recapture for the benefit of the Fund was an available alternative.

The opportunity for recapture and the methods by which it could be accomplished bore directly on the management agreement and what action the shareholders

would take respecting it. The disclosure of the recapture alternatives was necessary in order for the shareholders to make an informed decision on whether or not to approve the new management contracts or whether or not to continue or renegotiate the current ones.

We have already held that the management and distribution agreements contemplated the allocation of brokerage by M&D to secure sales, additional research, and statistical services, and that the shareholders were informed of this in proxy statements. The shareholders should also have been informed that by approving these agreements they were foregoing an opportunity to effect recapture and thus lower advisory fees—even if, as management contends, such fees might eventually have to be adjusted to give M&D additional funds to secure the services needed to maintain the Fund's performance which would no longer be obtained by allocating brokerage.

We do not go so far as to hold that every possible alternative to a particular policy must be spelled out in a proxy statement. *See Doyle v. Milton,* 73 F.Supp. 281 (S.D. N.Y. 1947). We recognize that such a rule would indeed tend to defeat the purposes of the proxy rules by

> bury[ing] the shareholder in an avalanche of trivial information—a result that is hardly conducive to informed decision-making.

*TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 448, 96 S.Ct. at 2132, 48 L.Ed.2d at 765–66.

But, in our view, the same considerations of clear conflict of interest between the adviser and the Fund which required management to supply the independent directors with full information concerning the recapture question so that they could reach an informed judgment on the subject also mandated disclosure to the shareholders of the recapture alternatives and the board's decisions thereon.

Management recognized that the decision to forego available recapture opportunities was a significant and controversial one which involved substantial amounts of mon-

ey. We have already seen the care taken to assure that this decision was legally permissible and the product of a carefully considered exercise of business judgment by a fully informed group of independent directors. We have also noted management's acknowledgment that the decision reached was "the closest kind of business decision." Yet, despite the repeated and extensive disclosures to the independent directors about recapture, the subject was never presented to the shareholders until 1972. This contravened the policy of the Investment Company Act as declared in its preamble,[36] rendered ineffectual the shareholders' approval of the management agreements, and deprived the shareholders of their right to terminate or seek renegotiation of the agreements under section 15(a)(3) of the Act, 15 U.S.C. § 80a–15(a)(3).

Under the circumstances here, disclosure of the fact that there were recapture opportunities which the Board had chosen to forego would have altered significantly the total mix of information available to a reasonable investor. There was a substantial likelihood that such disclosure would have assumed actual significance in a reasonable investor's deliberations concerning the management agreements. We view the omissions of any statements as to the recapture alternatives as "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 450, 96 S.Ct. at 2133, 48 L.Ed.2d at 766, and find such omissions material as a matter of law.

■ The proxy statements for 1972, 1973 and 1974 are in a different posture. While it failed to detail the available recapture techniques and the board's prior consideration of the issue, the 1972 proxy statement raised the possibility of recapture in its discussion of the proposed amendment to the Fund's certificate of incorporation, and

Judge Carter concluded that it was not false and misleading.

After viewing the facts omitted in the 1972 proxy statement against the disclosures that were made, *see TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 450–452, 96 S.Ct. at 2133–2134, 48 L.Ed.2d at 767–68, and giving appropriate weight to the assessments of the trier of the facts, *see TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 450, 96 S.Ct. at 2133, 48 L.Ed.2d at 766, we cannot say that there was such a substantial likelihood that a reasonable shareholder would have considered these omissions either important in deciding how to vote or as so significantly altering the "total mix" of information available that the district judge's finding that they were not material was erroneous under *Northway.* We reach the same conclusion with respect to the 1973 and 1974 proxy statements, which came after the stockholders had been put on notice as to the possibility of recapture and approved the certificate amendment explicitly providing for board control over allocation of brokerage omissions.

We hold that the proxy statements for the annual meetings in the years 1967, 1968, 1969, 1970 and 1971 were false and misleading under rule 14a–9 because of the omission of material facts. *See Galfand v. Chestnutt Corp., supra; Gerstle v. Gamble-Skogmo, Inc., supra.* We therefore reverse the holding of the court below that the proxy statements for these years did not violate the disclosure provisions of the federal securities laws. Responsibility for such omissions begins with the February 7, 1967 proxy statement since it is clear from the record that by then management and the independent directors had sufficient time to consider and react to the PPI report and make appropriate disclosures to the shareholders. *See Fogel v. Chestnutt, supra,* at

---

**36.** 15 U.S.C. § 80a–1(b) provides:

. . . it is declared that the national public interest and the interest of investors are adversely affected—

(1) when investors . . . vote, refrain from voting . . . securities issued by

investment companies without adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies . . . of such companies and their management . . . .

755, 755 n. 30; *Moses v. Burgin, supra,* at 385.

The case is remanded to the district court for determination of what damages, if any, were caused to the Fund by the proxy statements we have held to be in violation of rule 14a–9. *See Mills v. Auto-Lite Co., supra; Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).